# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION
## AT COVINGTON

CIVIL ACTION NO. 09-96-DLB-JGW

MIDAMERICAN DISTRIBUTION, INC.                                    PLAINTIFF

vs.                          **MEMORANDUM OPINION & ORDER**

CLARIFICATION TECHNOLOGY, INC., ET AL.                        DEFENDANTS

*     *     *     *     *     *     *

This is an action for breach of contract and unjust enrichment under Kentucky law brought by Plaintiff representative/distributor, MidAmerican Distribution Inc., against Defendant distributor, Clarification Technology, Inc. (CTI).

This matter is before the Court on cross motions for summary judgment by Defendant CTI (Doc. # 74) and Plaintiff MidAmerican (Doc. # 97). The motions have been fully briefed and, at the Court's request, supplemented. (Docs. # 118, 125, 126, 131, 133). Upon review of the briefs, the Court finds oral argument unnecessary. For the reasons that follow, Defendant CTI's motion for summary judgment is **granted**.

Cross motions for summary judgment are also pending between Defendant CRS Holdings, AG (Doc. # 77) and Plaintiff MidAmerican (Doc. # 98) on Plaintiff's alter ego claim. Those two motions have been held in abeyance pending disposition of Plaintiff's underlying claims against Defendant CTI. (Docs. # 106, 121). Because dismissal of the underlying claims against Defendant CTI also disposes of Plaintiff's claims against Defendant CRS, the abeyance is **lifted** and Defendant CRS's motion for summary

1

judgment is **granted**.

## I.  FACTUAL BACKGROUND

### A.  DRG Marketing, Inc. agreed to represent CTI's products

Defendant CTI, which does business under the trade name "Filtercorp," sells and distributes products used to filter and maintain frying oil in the food service market.[1]  (Doc. # 1-6 at 9).  DRG Marketing, Inc., a nonparty to this suit, was created by Dave Goble, Sr. to represent companies in the food service industry.  (Doc. # 58 at 13-14).  In 1996, CTI[2] and DRG entered a manufacturer's representative agreement which obligated DRG to represent Filtercorp products in exchange for a commission on each sale within its specified territory.  (Docs. # 58 at 24-25, 32; 58-3).  The agreement was to remain in effect for three years and continue thereafter for one-year periods unless terminated by either party.  (Doc. # 58-3 at 3).

Sometime around the beginning of 2001, CTI presented DRG with a proposed agreement, which would have altered DRG's role to that of a "licensed regional stocking distribution warehouse."  (Doc. # 58-4).  This proposed agreement represented a fundamental change in CTI's business model to a regional distribution warehouse (RDW) program.  (Docs. # 7 at 15; 74-1; 74-2; 74-3).  Under the new model, DRG (and other RDWs) would actually buy Filtercorp products, own the products, and sell them in the marketplace for a markup.  (Doc. # 58 at 32).  The RDW would receive exclusive

---

[1]  CTI has used several trade names.  (Doc. # 6 at 12).  This Memorandum Opinion & Order deals with the trade name Filtercorp, and for simplicity uses "CTI" and "Filtercorp" interchangeably.

[2]  CTI was incorporated in 2001.  CTI's predecessor was Fibercarb LLC, an entity which did business under the Filtercorp trade name and shared CTI's assets and shareholders.  (Docs. # 6 at 4, 7; 66-14 at 6-7).  For simplicity, this Memorandum Opinion & Order primarily uses the name "CTI."

2

distribution rights to Filtercorp products within its region.  (Docs. # 74-1; 74-2; 74-3).

The evidence does not establish whether DRG executed the 2001 agreement.  At his 2010 deposition, Goble stated that DRG "never signed it"—though he was unable to remember why.  (Doc. # 58 at 26-27).  The copy of the agreement in the record is unsigned.  (Docs. # 1-6 at 19; 58-4).  In response to Defendant CTI's request that Plaintiff "[a]dmit that an Agent for DRG Marketing, signed the 'Licensing and Distribution Agreement,'" Plaintiff responded, "Cannot admit or deny."  (Doc. # 1-3 at 44-45).  Plaintiff further represented that it had "made reasonable inquiry and the information known or readily obtainable is insufficient to enable an admission or denial."  (Doc. # 1-3 at 45).  By contrast, CTI's President, Robin Bernard, stated in a 2007 affidavit that "[o]n January 1, 2001, Filtercorp contracted with DRG Marketing (hereinafter DRG), a Kentucky company located in Florence, Kentucky."  (Doc. # 1-6 at 9).  Later, however, Bernard conceded that CTI has been unable to locate the document, though he stated that CTI's former President, Don Eskes, said that CTI and DRG executed the agreement.  (Doc. # 6 at 33).  Whether the agreement was signed or not, DRG and CTI continued to do business with DRG operating at an RDW under the Filtercorp trade name as Filtercorp MidAmerica (FCMA).[3] When asked about the terms of DRG's relationship with CTI, Goble explained that "the deal was always fluid; we operated in compliance with their (CTI's) direction.  (Doc. # 58 at 28).

**B.    The companies' initial involvement with Wendy's**

CTI first targeted Wendy's as a potential customer sometime between 1998 and 2000 after hiring an employee, Rick Gibson, who was working for a competitor at the time

---

[3]   "Filtercorp MidAmerica" or "FCMA" referred to DRG's region and is distinct from Plaintiff "MidAmerican," which took over DRG's role and the "Filtercorp MidAmerica" or "FCMA" trade name in 2004.

and was familiar with the Wendy's and McDonald's accounts. (Docs. # 7 at 14-15; 97-3 ¶ 5). CTI was unable to secure the account at this time, so it terminated Gibson and shifted its focus away from marketing to the largest national chains (e.g., McDonald's and Burger King). (Doc. # 7 at 16). CTI continued to work on Wendy's "to a degree" because of the investment it had already made toward securing it as a customer. (Doc. # 7 at 16).

In the early 2000s, Robin Bernard showed Goble a product and "said we need to take this into Wendy's." (Doc. # 58 at 47). About that time, Goble reached out to Mike Landis, who served as a liaison between operations and research and development at Wendy's. (Docs. # 6 at 12; 97-3 ¶¶ 2, 6). According to Landis, Goble was the first CTI representative who had contacted him for some time after his initial interaction with Gibson.[4] (Doc. # 97-3 ¶¶ 5, 6). Landis stated that from that point until Wendy's ultimate acceptance of CTI's product, Goble and Goble, Jr. (Goble's son and DRG's Filtercorp product specialist)[5] "worked exceptionally hard to sell Wendy's a filter pad product." (Doc. # 97-3 ¶ 7).

By July 2003, DRG's efforts began to show dividends as Landis agreed to test Filtercorp's product, even though the product was not a high priority of Wendy's executives at the time. (Docs. # 6 at 14; 97-3). The field tests were conducted in several Northern Kentucky Wendy's locations and supervised by Goble, Jr. (Docs. # 58 at 55-56; 63 at 9). The testing involved considerable effort on the part of DRG, as detailed in a letter from

---

[4] Laura Bernard, CTI's Chief Financial Officer (CFO) testified that Robin Bernard introduced Goble to Landis "[s]o that when we needed a local person that could just stop by Wendy's, we had one." (Doc. # 7 at 22). She also testified that "Goble did not introduce us to anybody at Wendy's." (Doc. # 7 at 22). For the purposes of this Memorandum Opinion & Order, "Bernard" refers to Robin Bernard, CTI's President and Laura Bernard's husband. The Memorandum Opinion & Order refers to Laura Bernard by her full name.

[5] Hereafter, "Goble" refers to "Goble, Sr." and "Goble, Jr." will be specified.

Robin Bernard to Mike Landis recommending a nine-step test implementation and evaluation program. (Doc. # 97-3 at 6-8). As Landis documented in a later email, these tests lasted for over two-and-a-half years and yielded "positive results," which led to expanded testing in June and July 2006. (Docs. # 58 at 55; 58-5).

### C. Plaintiff alleges that the "initial terms of the Wendy's deal" were laid out in a September 2003 email and subsequently supplemented

According to Plaintiff, it was shortly after Wendy's began testing Filtercorp's filter in July 2003 that CTI "formed the initial terms of the Wendy's deal." (Doc. # 97-1 at 7). This came in the form of an email from Robin Bernard to all the RDWs on September 2, 2003, which provided "the notes and minutes of the [2003 Mid-Year] Council Meeting." (Doc. # 69-14).[6] In the email, Bernard explained that the "National Account Program"[7] would be structured as follows:

> Basic split; 40% Distribution Region, 40% Specifying territory, 20% Destination territory. Distribution Region will receive a $5.00 per box minimum or 10% gross margin whichever is greater on pallet quantity shipments.[8]

The paragraph concluded with the qualification, however, that "payout is determined by the final negotiated price and gross margin available on a case by case basis for each national account." (Doc. # 69-14).

---

[6] The Council was made up of the principals (i.e., the owners) of the RDWs. (Doc. # 66-6 at 14).

[7] Bernard explained that "national accounts" are those accounts that extend beyond a single geographic region. (Doc. # 6 at 19).

[8] Bernard explained that $5.00 per box meant that CTI would sell the RDWs the box for $5 less than the RDW would sell the same box to Wendy's. (Doc. # 6 at 19). This margin constituted the RDWs' revenue. (Doc. # 6 at 19).

Sometime in the summer or fall of 2004, Goble determined that another of his companies, MidAmerican Distribution, Inc., which he had started in 2001 to import shelving products to be used in the food service industry, would be a more effective RDW than DRG, which was primarily a marketing and representation business. (Docs. # 58 at 18-19, 31; 58-2 at 96; 1-5 at 21-22). Accordingly, Goble shifted CTI's business with DRG to MidAmerican. (Doc. # 58 at 31). He communicated the change to CTI verbally, "and there didn't seem to be a problem with that at all." (Doc. # 58 at 33). CTI's President, Robin Bernard, has stated that CTI never executed a contract with MidAmerican and "DRG never requested assignment of its rights to MidAmerican Distribution Inc[.] and Filtercorp never authorized assignment." (Docs. # 1-6 at 10; 6 at 4).

Robin Bernard sent an email to Goble nearly a year later, in July 2004, that Plaintiff contends "reinforc[ed] the initial terms set out in the previous year." (Doc. # 97-1 at 7). The email explained that "[t]here are modifications to the earlier financial profiles we discussed through the earlier months" because "[q]uoting Wendy's a delivered price complicated the quotations." (Doc. # 66-7 at 37). It continued on to state that "[t]he purpose for creating this final financial model below for MidAmerican & the other 3 RDW's is to take into consideration any information that affects costs before publicizing final price sheets. Please look at the MidAmerica model below:" (Doc. # 66-7 at 37). The email detailed:

> Specifically, we were anticipating a $5.00 per carton margin for each RDW—on a weighted basis MidAmerica will now enjoy a $6.75 gross sales in the [sic] both the MidAmerica & Northeast Regions in the final model. This is the good news—the bad news is: in the other RDW's the only way Filtercorp could provide a gross sales margin of $5.00 per carton was to reduce the specification fee to $2.00 per carton.

A month later, in August 2004, Bernard sent Goble an email with a "Revised Price Performa" that showed MidAmerican receiving an average net margin of $6.72 for 30-count boxes and $11.49 for 60-count boxes. (Doc. # 58-17).

Plaintiff contends that by mid-2004 it was providing valuable services to Defendant CTI. First, a MidAmerican employee learned what CTI's competitor was charging Wendy's, and provided that information to CTI. (Doc. # 6 at 15). Second, as the July 2003 testing was reaching its first year anniversary, Goble continued to meet with his contact at Wendy's, Mike Landis, and believed things were going well. (Docs. # 6-7; 6-8; 97-3 ¶¶ 8, 10, 11). There is no evidence that Plaintiff had requested or received any compensation from CTI at this point, because CTI had not yet contracted with Wendy's.

### D. The Wendy's deal appears imminent and a new distribution agreement between CTI and the RDWs is discussed

In February 2006, more than two-and-a-half years after the first tests began in the Northern Kentucky locations, Wendy's was ready to expand testing into Cincinnati. (Doc. # 7-7). During this expanded testing phase, Wendy's expected CTI to "show [it] exactly how [CTI] would do an install and train the stores at both the store and district level." (Doc. # 7-7). At a planning meeting on April 5, 2006 attended by Goble, Jr. and Robin Bernard, it was decided that fifty Cincinnati-area Wendy's would test the product for 30-45 days. (Doc. # 6-11). The plan also called for Goble, Jr. to "be CTI's point on this training/roll out." (Doc. # 6-11). Less than a week after the meeting, Robin Bernard announced to all the RDWs that "Wendy's first official product rollout will be completed by May 1 [2006]. A special thanks to Dave Goble and Dave Goble, Jr. for the countless hours of work they contributed to make this project successful." (Doc. # 58-9). Subsequent events proved this

announcement premature.

Later in April 2006, Bernard sent another email to the RDW owners attributing the Wendy's "success story" to Goble, but informing them that the additional revenue Wendy's would produce "does not relieve each Regional Market's responsibility & obligation to meet its budget commitments." (Doc. # 58-13). To the contrary, "Wendy's revenue is a separate line item and will not be credited towards each region's revenue/profit budgets." (Doc. # 58-13). This meant that although the RDWs would receive their specified revenue for sales to Wendy's, CTI would not consider those sales in determining whether the RDWs met their sales quotas. (Doc. # 58 at 89-91). As Robin Bernard later acknowledged, the April 2006 email was the first time that CTI informed the RDWs that the Wendy's account would be independent of their general budget. (Doc. # 6 at 24). Bernard also explained, however, that it was his prerogative to set such a policy. (Doc. # 66-6 at 14). Laura Bernard further explained that the change had "no effect on Dave Goble" because sales quotas were set annually; if Wendy's was counted toward each RDW's quota, CTI would simply increase the quota to account for the dramatic increase in business. (Doc. # 66-12 at 14). Moreover, including Wendy's sales would have "skewed" all the RDWs' numbers, because it was such a large business. (Doc. # 7 at 27).

About the same time, in late May 2006, the RDWs collectively approached Robin Bernard to negotiate a new distribution agreement. In an email to Bernard, the RDWs' representative (Dave Kuelpman, the owner of Filtercorp Far West) listed a series of outdated or inaccurate provisions from the "original contract" (presumably the 2001 agreement). (Doc. # 58-16). The RDWs also noted that "our 5 year contract expired as of the end of 2005 and we are currently in a rolling 1 year program." (Doc. # 58-16 at 2).

Bernard agreed that "there have been too many changes over the years, and too many dollars involved between the parties to not be prudent with the legal structure of our relationship(s)" and suggested that the parties meet in August 2006 to discuss a new agreement. (Doc. # 58-16).

Meanwhile, Goble and Bernard had apparently discussed the relationship between their two companies and Wendy's pricing plans during a trip to Prague. Following the trip, Goble emailed Bernard on May 19, 2006, thanking him for opportunity to discuss "how we have gotten to this point and where we are going." (Doc. # 58-14). Goble explained to Bernard:

> It helps me allot [sic] when you commit that any changes to the Wendy's program will be done only after you and I have gotten together and looked at the numbers and determined what is right. Also that what we have in place will stay in place until we have that meeting. I will forward to you a copy of the letter outlining both the $5 per box and the $2 spec fee for the Wendy's pads.[9]

Later, Bernard acknowledged that he did agree to "spec fees for the entire country" though he "didn't agree necessarily to [the] numbers" that Goble had proposed. (Doc. # 6 at 25). To the contrary, Bernard testified that his message to Goble was that "at the end of the day, when the final pricing was done and the final costs were done, then we would set those margins. But $5 per box was minimum." (Doc. # 6 at 25). In his 2010 deposition, Bernard confirmed that his response was, "David, let's wait until the final deal is put together, [b]ut yes, we will work with you." (Doc. # 66-6 at 15). Goble's motivation was just the opposite; he wanted something more concrete: "I wanted something coming back to me in writing

---

[9] The $5 referred to an initial discount that MidAmerican would receive when purchasing filter pads from CTI. The $2 spec fee referred to the commission that MidAmerican would receive on each box of filter pads that the RDWs (including MidAmerican) would buy from CTI, to sell to Wendy's, regardless of territory. (Docs. # 97-1 at 14; 58-2 at 94-95).

that said this was the deal, because the deals have always been fluid." (Doc. # 58 at 95).

A few months later, in August 2006, CTI and the RDWs met for their biannual Council Meeting. The minutes to the meeting reveal that the parties discussed a new distribution agreement, as well as a "Wendy's Distribution Model." (Doc. # 59-2). Plaintiff contends that at this meeting, CTI "agreed to a 10-year term and price." (Doc. # 97-1 at 16). The minutes, however, reflect far less certainty.

Under the heading "New Distribution Agreement," the minutes stated that "[t]he new distribution draft agreement is targeted to be available for review September 1st" with the goal of having "all new agreements in place by January 1st 2007." (Doc. # 59-2 at 1). The minutes then outlined the six "primary topics discussed during the meeting," one of which was that "each Principal will be offered a term of 10 years to commence January 1 2007." (Doc. # 59-2). The "To Do" section of the minutes tasked Bernard with having "first draft[s] to principals by September 1st for review & comment." (Doc. # 59-2 at 1). The "National Accounts" section of the minutes provided pricing, but the "To Do" section required "Robin (Bernard) to develop price sheets for each Nat. Acct. with fee structure to distribution." (Doc. # 59-2 at 2).

The second heading was "Wendy's Distribution Model," and the minutes explained:

The Wendy's distribution model is based on Wendy's granting Filtercorp market share in FCFW, FCMA & FCSW regions. Each Distributor will import containers from either HOBRA (CRS's manufacturing mill in the Czech Republic) or Columbia mills and redistribute to authorized Wendy's distributors in the region. All Filtercorp price quotes have been "delivered" to authorized DC(s) (distribution center). The following is Filtercorp's basic distribution model;
    **FCMA** - $7.10 per ctn. discount
    **FCSE** - $5.00 per ctn. discount
    **FCSW** - $5.25 per ctn. discount

**FCFW** - $5.50 per ctn. discount

The additional $2.00 per ctn. discount to FCMA represents the Specification Credit. Destination Credit is not applicable in this model.

The "To Do" section required "Robin to finalize Wendy's negotiation and distribution Performa for each region." (Doc. # 59-2 at 2). In discussing this document, Laura Bernard said that the numbers changed each year because the deal "was fluid." (Doc. # 7 at 34). Robin Bernard, too, emphasized that the minutes embodied what was discussed at the meeting, but it was not "a policy document." (Doc. # 6 at 28). He emphasized that the ten-year term was merely "proposed." (Doc. # 6 at 28).

On August 28, 2006, before any draft agreement had been circulated, Goble and Bernard had a conversation, after which Bernard emailed Goble in an attempt to "clarify matters between FCMA (MidAmerican) & FC (Filtercorp/CTI)." (Doc. # 58-21). Specifically regarding the Wendy's account, Bernard stated that "we have had multiple discussions over the past couple of years as this account's business proposition has modified." Bernard estimated that "[t]he distribution Performa will be available for your review and approval no later than Wednesday of this week. I think you will find it embodies the spirit of our many conversations these past couple of years." (Doc. # 58-21). Later, Bernard explained that in that email he was "trying to tell David (Goble) that we don't have a deal yet" but that "we're getting pretty close." (Doc. # 66-6 at 21-22).

In the same email, Bernard updated Goble on the progress of a distribution agreement that CTI would execute with all the RDWs: "I am attempting to deliver a draft contract to each [RDW] principal for review & comment by months end. As stated during the Muirfield meeting, the replacement distribution agreement will be offered on a 10-year

11

term." (Doc. # 58-21).  Goble expressed his desire to "have all agreements signed and in-force by years end.  We look forward to your personal comments as the draft agreement is formalized later this year."  (Doc. # 58-21).

### E.    Goble seeks "clarity" on the companies' relationship, outside of formal negotiations regarding the new distribution agreement

Explaining that he "did not get the clarity [he] was looking for," Goble responded the next day, August 29, 2006, with six specific questions.  (Doc. # 58-22 at 1).  First, Goble asked: "Are we under a ten year agreement today?"  (Doc. # 58-21).  Goble later explained that this question referred not to a Wendy's agreement specifically, but to all business that MidAmerican had with CTI.  (Doc. # 58-2 at 14).  Bernard replied:

> No—FCMA (MidAmerican) is operating under the terms of the original agreement through December 31 2006.[10]  The new distribution agreement is in draft form.  The initial draft will be delivered to your office as soon as possible.  After its approval and execution, FCMA & CTI will operate under that agreement.  As we discussed in Muirfield, it is CTI's commitment to its Filtercorp distribution principles, including; FCMA, FCSE, FCSW & FCFA, the term for the new agreement will be 10 years.  I anticipate we will execute this agreement prior to the end of the year; however, the effective date will be January 1, 2007 as discussed.

Goble later stated that based on Bernard's response, at this point, "we were operating under a ten-year agreement in our minds."  (Doc. # 58-1 at 34).

Goble also asked: "What is the program for the Wendy's distribution and spec credits for the field?  You mentioned we would have this by Wednesday, but a heads up would help."  (Doc. # 58-22).  Bernard responded:

---

[10]  When asked whether he knew "what original agreement [Bernard] was talking about," Goble answered, "No."  (Doc. # 58-1 at 39).  He explained that whatever agreement Bernard was referring to "had expired" and he did not follow up "because it was clear that the new agreement *would be* for ten years."  (Doc. # 58-1 at 39) (emphasis added).  Goble was then asked: "You weren't really concerned about what was going on at the present then, because you were looking forward to the new ten-year agreement?"  (Doc. # 58-1 at 39).  He responded: "Everything was fluid."  (Doc. # 58-1 at 39).

> No problem—basically, the deal is a $5.00 discount to FCSW & FCFW & a $7.00 discount to FCMA. FCMA will receive a $7.00 discount for the NE, or a $2.00 Spec fee depending on CTI's distribution plan for this market, and a $2.00 spec fee for FCSE. A $.040-$0.50 marketing fee is in the Performa. The $1.25 destination fee is eliminated. Issues remaining begin with ensuring the model works on a delivered basis to the DC for all markets, thus, the delay. In addition, another complication exists between FCSW & FCFW regarding the Denver market—it must ship from Dallas to work; however, it is in FCFW's market—so, we are working on a compensation program between the two RDWs. Until distribution is finalized and published, this model is the backbone of the program consistent with the 2004 worksheets.

Bernard closed the email with his "sincere hope . . . that somewhere in the neighborhood of $325,000 annual gross profit prior to additional market expansion will help feed your family." (Doc. # 58-22). Bernard later characterized the $325,000 reference as "a snide little comment back to him" because that was Goble's gross margin "prior to Wendy's. . . . he had been getting that money for ten years." (Doc. # 6 at 31).

Goble responded to Bernard's email with: "Now a great big thanks for your commitment, although I never thought that it was different, I just wanted to feel positive about it." (Doc. # 58-22). When asked at his deposition whether, following these emails, "the deal with Wendy's [was] still fluid," Goble responded that "[i]t was a lot less fluid, based on this letter." (Doc. # 58-1 at 38).

However, Goble also acknowledged that the Wendy's business was far from certain in August 2006, because "[i]t had completely stalled in the [Wendy's] supply chain." (Doc. # 58-1 at 36). Goble had concluded that it "[j]ust didn't seem to be a high priority" for Wendy's, but nonetheless "didn't understand why it wasn't going forward." (Doc. # 58-1 at 36).

**F.     Wendy's approves CTI as an official supplier while CTI and its RDWs continue to negotiate a new distribution agreement**

In October 2006, Mike Landis recommended final approval of CTI's filter pad.  (Doc. # 6-15).  In an email to a member of Wendy's operations administration, Landis overviewed the years of satisfactory testing in Northern Kentucky, Cincinnati, and West Virginia.  (Doc. # 6-16).  Landis also identified Goble as "[t]he point person" and recognized that CTI had invested "nearly four years in an effort to become a Wendy's approved supplier" and is "determined to prove that service will not be an issue."  (Doc. # 6-16).  On December 12, 2006, Bernard announced that Wendy's had formally approved CTI as a supplier.[11]  (Doc. # 6-18).

Just a week before Wendy's final approval, Robin Bernard distributed a draft "Distributor Agreement" to the RDWs for comment.  (Doc. # 59-6).  Bernard highlighted some areas of concern, specifically the fact that the "National Accounts & definitions on the schedules are open for modification," as well as a termination without cause provision.  (Doc. # 59-6).  Accordingly, Bernard encouraged the RDWs to review the proposed agreement carefully and expressed his hope that the agreement could be completed in time for a "January 1st [2007] effective date."  (Doc. # 59-6).

On January 3, 2007, Dave Kuelpman, the RDWs' representative, circulated among the RDWs a proposed letter to Robin Bernard requesting a series of revisions to the draft distribution agreement.  (Doc. # 59-9).  Kuelpman's proposed letter was an attempt to

---

[11] Plaintiff emphasizes that Bernard recognized Goble's "above the call of duty" efforts in emails sent on December 5 and 12, as well as during CTI's annual business meeting in early 2007.  (Doc. # 97-1 at 20).  Defendant CTI does not dispute that MidAmerican (and Goble, in particular), expended great effort in securing Wendy's business.

incorporate issues raised in a conference call (and subsequent emails) between the RDWs that took place in response to Bernard's proposed distribution agreement. (Doc. # 59-9).

Goble later explained that the RDWs did not agree on how to respond to Bernard's proposed agreement. In particular, Goble was concerned about whether Wendy's would be a national account and, if so, how that would affect MidAmerican's spec credit, i.e., MidAmerican's commission on Wendy's orders. (Doc. # 58-1 at 76). Because MidAmerican was the only RDW that would receive spec credit, the others "didn't care" about the issue. (Doc. # 58-1 at 76). Though Kuelpman's email solicited "approval or changes," from the RDWs, Goble was unable to recall whether he responded. (Doc. # 58-1 at 79). At his deposition, Goble explained that he was not concerned about the proposed contract because MidAmerican and CTI were operating under the terms of Bernard's August 30, 2006 email—"[t]he one that said we would make 325,000 a year if Wendy's bought the products, if we closed the deal." (Doc. # 58-1 at 79) (referencing Doc. # 58-22).

On January 27, 2007 Bernard responded with a revised proposed agreement that incorporated some, but not all, of the RDWs' requests. Kuelpman characterized the concessions to the RDWs as "[s]everal key wins." (Doc. # 59-13 at 1). Goble, however, was far from satisfied with the progress, calling CTI's concession that it would pay $1 per carton severance fee in case of termination "insignificant compensation for services rendered." (Doc. # 58-2 at 5). Goble's concerns with the proposed agreement were driven by his belief that the Wendy's agreement, which he believed was formed by the August 30, 2006 email from Bernard, would have been superseded "without special exemption" by a new agreement. (Doc. # 58-2 at 7).

Goble renewed his concerns at CTI's annual meeting in Anaheim, which took place a few days later, from January 30 until February 1, 2007. (Docs. # 6-20; 58-2 at 6). When asked to characterize the tenor of the discussion, Goble responded that he didn't "want to say [it was] argumentative, but there was not complete agreement on this (the new agreement) at all." (Doc. # 58-2 at 6).

Nonetheless, on February 1, 2007, Goble emailed Laura and Robin Bernard thanking them "for confirming the program for all the RDW's last evening at the KLH office and on the course today, that being a $2 fee for a box of 30 pads and $4 fee [for] a box of 60 pads credited monthly for purchases made by Far West, Southwest and in the future Southeast (the other RDWs). The distribution discount will be $5 for a 30 count and $10 for a 60." (Doc. # 59-14). Goble said that he sent this email to confirm a conversation they had had in Anaheim, and believed he needed to do so because the situation was still fluid at this point. (Doc. # 58-2 at 17). At his deposition Bernard confirmed that these numbers were "close" to the ultimate deal, but that he later learned that Goble wanted "a specification fee also for his own region, and that has never been the deal in our 20 years." (Doc. # 66-6 at 30). Bernard contended that "[i]t was never that way, and I did not realize that he had a problem with that, really, until the deposition." (Doc. # 66-6 at 30).

Robin Bernard announced to the RDWs on February 9, 2007 that beginning June 9, 2007, CTI would no longer accept American Express for Wendy's orders. (Doc. # 59-15). Bernard acknowledged that at the Anaheim meeting he had "declared [that] Filtercorp would not change its Terms on the Wendy's business until the September Meeting," but after spending a week reviewing costs with the manufacturing partners found himself "in the uncomfortable position of reversing [his] statement." (Doc. # 59-15). Goble explained

that this change in terms illustrated the fluid nature of MidAmerican's relationship with CTI: "You know, we were operating under an agreement and then it changes."  (Doc. # 58-2 at 19).

An email on February 20, 2007, however, revealed that Goble and Bernard had discussed the American Express issue and reached an alternate arrangement.  According to the email, beginning June 9, 2007, CTI would accept 60-day payment terms for Wendy's orders, instead of the normal 45-day payment terms.  (Doc. # 59-16).

On the same day that Bernard informed the RDWs that American Express would no longer be accepted, Bernard emailed Goble to "to ask [for his] help" by considering CTI's "request to voluntarily reduce [MidAmerican's] specification fee."  (Doc. # 59-17).  Bernard explained that two pressures had reduced CTI's anticipated margins.  First, CTI's price quote to Wendy's had decreased since the first quote in 2003 and, second, its manufacturers' costs had risen.  (Doc. # 59-17).  Goble agreed to voluntarily reduce MidAmerican's spec fee.  (Docs. # 66-6 at 35).  Bernard later pointed to this email as probably when "the final numbers are coming out.  That's the final deal. . . .  And that was why we always said, let's wait and see how the numbers come out."  (Doc. # 6 at 34).

### G.    All RDWs, except MidAmerican, sign the new distribution agreement

On February 21, 2007, Bernard distributed the final draft of the new distribution agreement.  (Doc. # 59-18).  Bernard asked each RDW to execute an original copy of the agreement and return it to CTI.  The agreement was to last ten years, commencing January 1, 2007.  (Doc. # 59-18 at 2).  "Having confidence all the RDW's concerns were addressed, [Kuelpman, on behalf of Filtercorp Far West] executed two original agreements and returned one original to CTI."  (Doc. # 74-1 at 2).  As the representative of the RDWs,

17

Kuelpman stated that he "heard no further concerns from any of the RDW's after the final draft was sent and received." (Doc. # 74-1 at 2). Goble, on behalf of Plaintiff MidAmerican, however, did not sign the agreement because the concerns he had expressed all along remained unaddressed in the new distribution agreement. (Doc. # 58-2 at 25).

### H. The RDWs agree to allow CTI to ship pads directly to Wendy's while CTI recovers losses from disastrous rollout

As Bernard was distributing the final draft of the new distribution agreement, CTI began receiving reports from Wendy's franchises that its first batch of filter pads—shipped during CTI's grand rollout—was defective. (Docs. # 7 at 39; 66-13 at 30). Goble Jr. began investigating the problem, including having the pads tested at Miami University, and determined that the defective pads were not the same as those that had been extensively tested by Wendy's. (Docs. # 66-1 at 55; 66-5 at 11; 6-25). Apparently CTI had used filter pads manufactured by a mill in Mexico during the in-store testing phase. After formal approval from Wendy's, however, CTI had filled part of the initial large order with pads made to the same specifications as the test pads, but manufactured in CRS's mill in the Czech Republic.[12] (Doc. # 59-19). CTI moved quickly to quarantine the defective product and promised to replace it at its own expense. (Doc. # 66-13 at 30-31).

On March 5, 2007, Bernard updated the affected RDWs on the cause of the problem and the steps taken to address it. (Doc. # 59-19). CTI conceded that because it could not supply Wendy's with pads manufactured by the mill in the Czech Republic, "the challenge

---

[12] Plaintiff emphasizes that CTI deceived Wendy's by primarily testing a pad manufactured in Mexico, but then providing a pad manufactured in the Czech Republic during the official rollout. (Doc. # 97-1 at 23-24). Plaintiff also points out that Goble, Jr. provided a report on the problem to Bernard, but when Bernard forwarded the message to Wendy's he altered "some very important items in the findings" and effectively lied to Wendy's. (Doc. # 97-1 at 23). These observations are irrelevant to Plaintiff's claims against CTI; whether they give rise to a claim by Wendy's against CTI is an issue the Court need not address.

of continuing supply with no standing inventory has been difficult at best." (Doc. # 59-19).

Accordingly, Bernard explained that CTI "has needed to expedite pallets directly to Wendy's DC's [distribution centers] suspending normal channel operations until it is possible to begin shipping containers again to each RDW." (Doc. # 59-19). Bernard continued:

> Filtercorp's commitment to ensure uninterrupted supply and complete recall of any out-of-spec product has put huge financial strain on the Company. As a result of the recall, quarantine/re-work and expedited inventory, not only has any profit entirely evaporated from the program, but it is actually costing the Company many thousands of dollars. Filtercorp requests that each RDW authorize the Company to invoice on a direct basis until the container program restarts. It is anticipated each RDW will begin receiving merchandisable product in container shipments by the end of April first part of May. At that time direct shipping will suspend as each RDW beings to fill and invoice orders again.

Goble later explained that by cutting the RDWs out of the process, and shipping directly to Wendy's distribution centers, CTI would not have "to pay out a $5 distribution fee per box or $2 spec fee per box" which amounted to "a tremendous savings for them." (Doc. # 58-2 at 33-34).

Though the RDWs knew that they were sacrificing additional revenue, they agreed to the change because, as Goble explained, everyone "understood the sense of urgency to get working product to the customers" and that "[t]here was no other avenue to take." (Docs. # 58-2 at 28-29; 74-1 at 2).

On April 17, 2007 Bernard sent the RDWs another update on the Wendy's rollout failure. The email attached a letter from Christian Rusch, a member of CRS's board of directors (the 97% owner of CTI), which tallied the Wendy's rollout losses at over $800,000—approximately $581,000 was CTI's losses and around $250,000 was losses to CRS's Czech Republic factory. (Doc. # 59-20 at 3). The letter also explained that CTI's

"extraordinary" $600,000 line of credit with CRS was fully drawn and would not be extended. (Doc. # 59-20 at 3). Rusch closed by asking Bernard to develop a plan to bring CTI back to profitability and expected "severe actions, whether popular or not, to lead the company out of this crisis." (Doc. # 59-20 at 3).

Bernard told the RDWs that his answer for Rusch was that CTI would "need to continue shipping directly to Wendy's through the end of this year (2007) to recover approximately $800,000 of losses suffered during roll-out." (Doc. # 59-20 at 2). At the same time, Bernard reaffirmed CTI's "longstanding policy" to "distribute its products through RDW partners" and gave his "word that this policy will also apply to the Wendy's business once Filtercorp has recovered its losses for this business." (Doc. # 59-20 at 2). Goble did not question Bernard about his factual assertion or his pledge to return the product to the RDWs during the conference call that took place a few days later. (Doc. # 58-2 at 33). Instead, during the conference call all the RDWs—including Goble on behalf of MidAmerican—agreed to allow CTI to bypass the RDWs and ship directly to Wendy's distribution centers in an attempt to offset the losses CTI incurred during the rollout failure. (Doc. # 74-1 at 3).

On July 12, 2007, Bernard emailed the RDWs CTI's six-month revenue report. In that email, Bernard formally announced that "Wendy's distribution will commence through respective Regional partners (RDWs) beginning January (2008) regardless of Filtercorp's year-end position of recovery from this year's losses in this business." (Doc. # 59-22).

## I. First overt signs of strain between CTI and MidAmerican

Five days later, Goble emailed Bernard and asked how the Wendy's program was progressing and when Bernard thought it would return to the RDWs. (Doc. # 59-23).

Goble explained the reason for this email was that he thought CTI may have recovered its losses more quickly than anticipated and, if so, that it would incorporate the RDWs sooner than anticipated. (Doc. # 58-2 at 43-44). But in response Bernard quoted his July 12, 2007 revenue report (circulated five days earlier) which formally announced that distribution through the RDWs would commence in January 2008, regardless of CTI's year-end position. (Doc. # 59-23). Bernard confirmed to Goble that CTI was committed to this plan, even though it would not recover its total losses until the end of the first or second quarter of 2008. (Doc. # 59-23).

Bernard's response also expressed concern that MidAmerican was not meeting its obligation "to field a professional salesman in the territory." (Doc. # 59-23). Bernard said CTI would be "satisfied if you follow through with recruiting an appropriate individual to work the territory." (Doc. # 59-23). Goble later contended that he did not respond because Bernard "knew" that Goble, Jr. was MidAmerican's Filtercorp specialist. (Doc. # 58-2 at 42, 45). After all, Goble, Jr. had been recognized for his assistance in discovering and addressing the problem that had led to the Wendy's rollout failure. (Doc. # 58-2 at 45-46). Bernard later explained that although Goble, Jr. "did a very good job on Wendy's. . . . that business did not take all of his time. . . . David's job was not as a field specialist." (Doc. # 66-6 at 40). CTI's CFO, Laura Bernard, however, acknowledged that the Gobles were field specialists. (Doc. # 66-13 at 5).

There was also an email exchange on August 1, 2007 in which Goble referenced an "agreement" to pay MidAmerican $1 a box spec fee, i.e., $1 a box commission, while distribution was being done outside the RDWs. (Doc. # 59-24). Goble explained in the email that Wendy's was selling fewer cartons than anticipated, which cut into

MidAmerican's expected revenues. (Doc. # 59-24). At his deposition, Goble acknowledged, however, that he never accepted a deal for a $1 spec fee; instead, the $1 spec fee was merely proposed by Kuelpman during a conference call as a way to compensate MidAmerican for its efforts while CTI was distributing directly to Wendy's. (Doc. # 58-2 at 48-49). Goble apparently received checks from CTI for the $1 spec fee, but never cashed them because he maintained throughout that MidAmerican was entitled to a $2 spec fee. (Doc. # 58-2 at 49-50).

Other indications of the strains in CTI's and MidAmerican's relationship surfaced in an email Bernard sent Goble on August 9, 2007 wherein he expressed concerns about their personal and business relationships. (Doc. # 59-25). Bernard also said that he had consulted an attorney with thoughts of informing Goble that MidAmerican was in breach of its obligation to have a Filtercorp field specialist on staff. (Doc. # 59-25). Instead, Bernard merely warned Goble that he would "no longer tolerate an RDW not having a Field Specialist." (Doc. # 59-25). Bernard also noted that MidAmerican had not executed the new distribution agreement. "If you want to stay in the deal," Bernard concluded, "convince me." (Doc. # 59-25).

Goble responded the same day, stating that "we want to be in the deal, period." (Doc. # 59-25). Goble acknowledged that "from our perspective we maybe have not been treated as others in the (RDW) group have been" but concluded that "on the whole" MidAmerican "feel[s] good about Filtercorp." (Doc. # 59-25). Regarding the field specialist, Goble explained that over the past three years, MidAmerican had "Bob Driscoll, Tom Phill[i]ps and David [Goble] Jr working the line and made an offer to a sales person last week that was turned down." (Doc. # 59-25). Nonetheless, Goble assured Bernard that

MidAmerican would "continue to look to find the right person and will hire him as quickly as possible." (Doc. # 59-25). Goble later explained that this promise referred to his long-standing decision—previously communicated to Bernard—to hire two Filtercorp field specialists when MidAmerican got the Wendy's business. (Doc. # 58-2 at 54). Finally, Goble told Bernard that the "only part" of the new distribution agreement that he thought was unfair was the requirement to arbitrate grievances in Seattle. (Doc. # 59-25).

The next day, August 10, 2007, Bernard sent a letter expressing his concern regarding MidAmerican's marketing and sales on behalf of CTI, and observing that MidAmerican had failed to maintain a Filtercorp product specialist as required by the Licensing and Distribution Agreement. (Doc. # 59-26). Accordingly, Bernard gave MidAmerican notice that it was "in breach of the Agreement (Section 17.2.3)" and had thirty days to cure the breach by hiring a product specialist and submitting a "sales and marketing plan which substantiates your desire to grow Filtercorp sales in your region." (Doc. # 59-26). Goble has testified that he was and remains unsure of what agreement Bernard referred to.[13] (Docs. # 58-2 at 64; 63 at 51-52). Instead, Goble believed that the parties were operating under the agreements that had been established via email. (Doc. # 58-2 at 64).

On September 4, 2007, Goble reported that MidAmerican had hired a Filtercorp product specialist who would be starting within the month. (Doc. # 59-28). On September 18, 2007, Goble informed Bernard that he would have a business plan ready to give him

---

[13] CTI was most likely referring to the January 1, 2001 "Licensing and Distribution Agreement," available as Doc. # 58-4. As discussed, *supra* Part I.A, however, the record does not conclusively establish whether DRG actually executed this agreement.

the following day, when they met in Chicago for the biannual Council Meeting.  (Docs. # 59-29; 58-2 at 76).  Goble and Bernard met for dinner in Chicago, during which Goble presented Bernard with a six-month business plan and the two discussed how their companies would move forward.  (Doc. # 66-6 at 43).  After dinner, Goble slipped Bernard a letter, which Bernard did not review until he returned home from Chicago after the Council Meeting.  (Doc. # 66-6 at 43).

The letter from Goble, dated September 18, 2007, asked Bernard "get going on a new agreement" which will void "anything in the past."  (Docs. # 58-2 at 77; 59-30).  The letter communicated Goble's "strong belief" that CTI would not have the Wendy's account "if it wasn't for the efforts of my company."  (Doc. # 59-30).  "Therefore," Goble continued, "I want you to agree to pay me" $311,000[14] for the product CTI delivered to Wendy's from February 1, 2007 through December 31, 2007."  (Doc. # 59-30).  Goble further requested that CTI "compensate MidAmerican Distribution a minimum of $324,000 annually for 10 years for distributing the product to existing Wendy's approved partners as was in place on February 1, 2007."  (Doc. # 59-30).  Goble continued on, stating that "[t]his would be payable in equal monthly installments, and due and owing even if the[ ] distribution changes from MidAmerican to other regions, and regardless of whether MidAmerican, Filtercorp, or any other party handles distribution of the Filtrox product designed for Wendy's."  (Doc. # 59-30).  Goble closed:  "By your signature below, you agree and bind Clarification Technologies to the terms listed above."  (Doc. # 59-30).  Instead of agreeing, at the top

---

[14]  Goble later explained how he reached $311,000.  He believed, based on the August 30, 2006 email, that CTI owed MidAmerican $325,000 annually.  Wendy's rollout began February 2007, so he was owed eleven months of revenue, totaling, $297,000; with interest, the total came to $311,000.  (Docs. # 58-2 at 78-79; 58-30).

of the letter is a handwritten notation, "Rejected 9/25/07 Robin Bernard." (Doc. # 59-30).

On September 25, 2007—the same day that Bernard rejected Goble's new proposal—Bernard emailed Goble his summary of the dinner meeting they had had in Chicago nearly a month earlier. (Doc. # 59-31). For Bernard, "the most important result from our meeting was the shared interest that MidAmerica remains in the Filtercorp program." (Doc. # 59-31). Bernard viewed Goble's decision to hire a qualified regional sales manager as an act of "good faith," but Bernard renewed CTI's demand that to fully cure its breach, MidAmerican must enact an "approved sales plan for the region during the next six (6) months."[15] (Doc. # 59-31). Bernard also informed Goble that his "request to renegotiate language or intent in the Distribution Agreement adopted by the Council last January 2007" was rejected because the agreement had been finally adopted by CTI and the RDWs in February 2007. (Doc. # 59-31). Further, MidAmerican's "request to isolate a separate agreement defining payment of fees associated with Wendy's business to MidAmerica is rejected." Finally, "[p]ayment of fees to MidAmerica from the Wendy's business has already been defined in practice. This defined payment plan will reinstate January 1 2008 as we discussed." (Doc. # 59-31).

On October 2, 2007, Bernard emailed the RDWs and informed them that, as previously promised, they would receive the Wendy's business beginning January 1, 2008. (Doc. # 59-32). Bernard set out a schedule whereby CTI would ship filter pads to MidAmerican on November 7, December 10, and December 21, 2007; then, beginning January 1, 2008, MidAmerican "will begin shipping Wendy's product to designated

---

[15] Goble acknowledged that the RDWs were required to submit sales plans to CTI on a regular basis. (Doc. # 58-2 at 83).

authorized Wendy's distribution centers on its own account." (Doc. # 59-32). In short, CTI was "transferring the Wendy's distribution business back to its RDWs partners as promised last spring." (Doc. 59-32). However, the relationship between MidAmerican and CTI concluded before the scheduled shipping took place. The other affected RDWs confirmed that CTI shipped on schedule and returned the Wendy's business as promised. (Docs. # 74-1; 74-2; 74-3).

The same day that Bernard informed the RDWs that they would be receiving the Wendy's business, Bernard emailed Goble a summary of a telephone conversation the two had had earlier that day, and invited Goble to correct any inaccuracies.[16] (Doc. # 59-33). According to Bernard's email, he first asked why MidAmerican had not executed the new distribution agreement. (Doc. # 59-33). Goble apparently responded that he did not feel that the agreement was in the best interest of MidAmerican, absent a separate agreement governing the Wendy's distribution business. (Doc. # 59-33). Bernard responded by quoting his September 25, 2007 email, which expressly rejected a separate Wendy's agreement. (Doc. # 59-33). Bernard closed by stating CTI's position: "Filtercorp must have an executed 'Distributor Agreement' in its possession by not later than October 15th of this month. If it has not received FCMA's executed agreement by this date, the HOBRA-Skolnik shipments scheduled to ship to FCMA Florence, KY will be diverted to Filtercorp's Chicago warehouse until this dispute is resolved." (Doc. # 59-33).

---

[16] Bernard emailed the RDWs the shipment schedule at 1:25 p.m. on October 2, 2007. He emailed Goble a summary of their conversation at 7:03 p.m. that day. Goble does not recall, and it is not clear from the record, whether the telephone conversation occurred before or after Goble had received the shipment schedule from Bernard. (Doc. # 58-2 at 92).

## J.    MidAmerican files suit and CTI terminates their relationship

On October 17, 2007, MidAmerican filed suit against CTI in Boone Circuit Court. (Doc. # 1-6 at 32).  CTI had not yet terminated MidAmerican when it filed suit.  But, on October 26, 2007, CTI's attorney notified Plaintiff[17] that it was terminated for failure to satisfy the minimum sales requirements, as set out in January 2001 Licensing and Distribution Agreement between DRG and CTI.[18]   (Doc. # 74-4).   CTI executed a distribution agreement with a new RDW, Zink Marketing, on December 26, 2007, which now does business under the Filtercorp trade name as Filtercorp MidAmerica.  (Doc. # 74-6).  The new RDW began sales and distribution to Wendy's in 2008.  (Doc. # 74-6).

## K.    Procedural Posture

After Plaintiff filed suit in Boone Circuit Court, Defendant CTI moved to dismiss for failure to state a claim upon which relief can be granted, failure to join an indispensable party, and on grounds that Plaintiff was not the real party in interest.  In early 2008, the Boone Circuit Court construed Defendant's motion to dismiss as a premature motion for summary judgment and denied it.  Shortly thereafter, Defendant moved for reconsideration, arguing that it should be dismissed for lack of personal jurisdiction.  In May 2008, the Boone Circuit Court again denied Defendant's motion.

In May 2009, Plaintiff filed an Amended Complaint, which alleged that CRS Holdings, AG, a Swiss corporation that now owns 97% of CTI, is Defendant CTI's alter ego. Shortly thereafter, CTI filed a motion for summary judgment.  In June 2009, the Boone

---

[17] There were actually two letters.  The first terminated DRG—the first of Goble's businesses that had previously done business with CTI—and the second terminated MidAmerican.  (Docs. # 74-4; 74-5).

[18]  As discussed Part I.A, *supra*, it is unclear from the record whether DRG (the RDW before MidAmerican) actually executed this agreement.

Circuit Court denied Defendant CTI's motion for summary judgment as premature.

On July 1, 2009—nearly two years after the original Complaint was filed—Defendant CRS removed the action to this Court. (Doc. # 1). Defendant CRS then moved to dismiss for lack of personal jurisdiction. (Doc. # 5). After the motion was fully briefed, the Court conducted an oral argument in October 2009, at which time it denied Defendant's motion. (Doc. # 21).

Defendant CRS next sought to bifurcate Plaintiff's breach of contract and unjust enrichment claims against CTI, from Plaintiff's alter ego claim against CRS. (Doc. # 30). CRS contended that CTI's potential contractual liability to Plaintiff was separate and distinct from whether CRS was CTI's alter ego. Accordingly, CRS argued that the equitable remedy of piercing the corporate veil (to reach CRS) should only be pursued if, and when, CTI was found liable on the underlying claims and was unable to a satisfy a resulting judgment. In February 2010, the Magistrate Judge denied CRS's motion as premature, with right to renew following a period of preliminary discovery. (Doc. # 38). The Court affirmed the Magistrate Judge's Order over CRS's objections. (Doc. # 46). In November 2010, Defendant CRS renewed its motion to bifurcate. (Doc. # 56). This time the Magistrate Judge granted CRS's motion (Doc. # 73), and the Court affirmed over MidAmerican's objections. (Doc. # 93).

While the bifurcation motion was pending, and on the final day of discovery, Plaintiff MidAmerican moved for leave to file a Second Amended Complaint. (Doc. # 84). Plaintiff's proposed Second Amended Complaint would have altered several factual allegations, and added a promissory estoppel claim against CTI. The Magistrate Judge denied Plaintiff's motion to amend (Doc. # 120) and the Court affirmed (Doc. # 135).

## II.    ANALYSIS

Rule 56(a) entitles a moving party to summary judgment if that party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(c)(1) further instructs that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by" citing to the record or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The "moving party bears the burden of showing the absence of any genuine issues of material fact."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  The moving party may meet this burden by demonstrating the absence of evidence concerning an essential element of the nonmovant's claim on which it will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts,"  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, it must produce specific facts showing that a genuine issue remains.  *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000).  If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted.  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d

1472, 1479-80 (6th Cir. 1989). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

### A. Article II of the Uniform Commercial Code does not apply

Kentucky adopted Article II of the Uniform Commercial Code (UCC) effective as of July 1, 1960, codified at KRS Chapter 355.2. *A & A Mech., Inc. v. Thermal Equip. Sales, Inc.*, 998 S.W.2d 505, 509 (Ky. Ct. App. 1999). Article II of the UCC applies to "transactions in goods." KRS 355.2-102. Defendant CTI argues that the alleged agreement is one for the sale of goods (i.e., filter pads from CTI to MidAmerican) and is therefore governed by Article II of the UCC. (Doc. # 74 at 17). Plaintiff MidAmerican concedes that the alleged agreement involved the sale of goods, but contends that the "predominate purpose of their agreement was for MidAmerican to service Wendy's, not to buy filters from CTI," and, accordingly, is not governed by Article II. (Doc. # 97-1 at 38). For the reasons that follow, the Court agrees with Plaintiff on this point.

Kentucky's highest court has instructed that in determining the true nature of a contract, "isolated expressions in the instrument" are "not necessarily controlling." *Buttorff v. United Elec. Labs., Inc.*, 459 S.W.2d 581, 585 (Ky. 1970). Instead, "courts will ignore apparently inconsistent language used, and look to the real nature of the agreement between the parties, what its real purpose was, and what, from the nature of the transaction, must have been in the minds of the parties." *Id. Buttorff* involved a contract that required plaintiff to market and establish distributorships for a camera, and in exchange, defendant would sell plaintiff the cameras for about $500 less than their resale

price. *Id.* at 583. In practice, however, plaintiff never took title of the cameras. *Id.* Instead, plaintiff forwarded orders to defendant, who shipped the cameras directly to the customers; the customers paid defendant who, in turn, remitted plaintiff's commission to him. *Id.* The court held that the contract was "not for the sale of goods as such but [was] a contract for personal services." *Id.* at 585. Accordingly, Article II of the UCC did not apply. *Id.*

The Kentucky Court of Appeals distinguished *Buttorff* in holding Article II of the UCC applicable in *Leibel v. Raynor Manufacturing Company*, 571 S.W.2d 640, 642-43 (Ky. Ct. App. 1978) because plaintiff was not merely a commissioned salesman, but a dealer-distributor who bought and resold goods. In *Leibel*, the manufacturer was to sell and deliver garage doors to the distributor, who would then sell, install, and service the garage doors to customers. *Id.* at 641-42. The Kentucky court held that the UCC applied because "the time has come to recognize that a distributorship agreement must be recognized as an agreement for the sale of goods and subject to the provisions of Article II of the Uniform Commercial Code, which has been adopted by Kentucky." *Id.* at 643. Thus, in Kentucky, "[t]he UCC applies to transactions in goods, including mixed contracts for goods and services where the predominant factor is the sale of goods." *Marley Cooling Tower Co. v. Caldwell Energy & Envtl., Inc*, 280 F.Supp.2d 651, 659 (W.D.Ky. 2003).

As the Sixth Circuit has observed, however, "[o]ne can imagine a distributorship agreement in which the service component predominates over the goods component." *Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d 607, 612 (6th Cir. 2001). And as Plaintiff argues, this is such a case. First, this is unlike a typical distributorship, as in *Leibel*, where the distributor purchases product from the manufacturer and then enters bilateral contracts with customers. Instead, Defendant CTI contracts with the customer (in this

case, Wendy's) for a certain price and quantity of goods, then sells that quantity to Plaintiff MidAmerican at a pre-arranged, discounted price. MidAmerican must then sell to the product to the customer at the price Defendant CTI arranged. Thus, unlike a typical distributorship, and more like a commission-based system, Plaintiff does not directly control its margins or volumes.

Additionally, the negotiations between the parties contemplated a straight commission to MidAmerican for the products sold to Wendy's outside its territory. That is, Plaintiff would effectively be paid for the services it rendered in securing Wendy's as a CTI customer, even when Plaintiff would not be involved in the sale of goods.

Lastly, Laura Bernard characterized Plaintiff MidAmerican's role as far more than distributor who bought and resold Filtercorp products. When asked about MidAmerican's role in landing Wendy's she responded: "[D]id Dave Goble and his son assist us? Tremendously, yes. Absolutely. It was their job. They were manufacturers' representatives." (Doc. # 7 at 15). Laura Bernard continued on to explain that the "very specific reason" for developing the RDW program "was to have strong representation in" the major regions of the United States. (Doc. # 7 at 15). Indeed, to ensure strong representation, CTI required the RDWs to have at least one Filtercorp field specialist on staff. (Doc. # 7 at 15). Robin Bernard even went so far as to call the RDWs "partners." (Doc. # 6 at 37).

Because the relationship between CTI and its RDWs is more than that of a manufacturer and distributor, the Court finds that *Leibel* is not controlling. Instead, as directed by *Buttorff*, 459 S.W.2d at 585, after "look[ing] to the real nature of the agreement between the parties, what its real purpose was, and what . . . must have been in the minds

32

of the parties" the Court holds that the parties' relationship (and any alleged agreement) was predominately for services, rather than goods. Accordingly, the UCC is not applicable, and Kentucky common law governs this case.

**B. Plaintiff's alleged "Wendy's Agreement" is unenforceable for indefiniteness**

Under Kentucky law, "[t]o prove breach of contract, the complainant must establish three things: 1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Metro Louisville/Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009). Thus, "[t]o establish a breach of contract claim under Kentucky law, the plaintiff must show by clear and convincing evidence that an agreement existed between the parties." *Associated Warehousing, Inc. v. Banterra Corp.*, No. 5:08-cv-52-TBR, 2010 WL 2745981, at *2 (W.D.Ky. July 9, 2010). Of course, "[n]ot every agreement or understanding rises to the level of a legally enforceable contract." *Kovacs v. Freeman*, 957 S.W.2d 251, 254 (Ky. 1997). Rather, a valid contract requires "offer and acceptance, full and complete terms, and consideration." *Coleman v. Bee Line Courier Serv., Inc.*, 284 S.W.3d 123, 125 (Ky. 2009) (quoting *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. Ct. App. 2002)). Though the parties vigorously dispute whether there was an offer and acceptance, the Court finds that the alleged contract did not include full and complete terms, and is therefore unenforceable for indefiniteness.

Kentucky case law has firmly established that "an enforceable contract must contain definite and certain terms setting forth promises of performance to be rendered by each party." *Kovacs*, 957 S.W.2d at 254 (citing *Fisher v. Long*, 172 S.W.2d 545 (Ky. 1943)). The court in *Quadrille Business Systems v. Kentucky Cattlemen's Association, Inc.*, 242

S.W.3d 359, 364 (Ky. Ct. App. 2009) explained that "[w]hile the agreement need not cover every conceivable term of the relationship, it must set forth the 'essential terms' of the deal." (quoting *Auto Channel Inc. v. Speedvision Network, LLC*, 144 F.Supp.2d 784, 790 (W.D.Ky. 2001)). Accordingly, "[w]here an agreement leaves the resolution of material terms to future negotiations, the agreement is generally unenforceable for indefiniteness unless a standard is supplied from which the court can supplant the open terms should negotiations fail. *Cinelli v. Ward*, 997 S.W.2d 474, 477 (Ky. Ct. App. 1998).

Three cases help define the contours of Kentucky's rule that an agreement must be sufficiently definite to be enforceable. First, in *Cinelli*, 997 S.W.2d at 476, the parties entered an agreement for plaintiff to loan defendants $2.65 million at a future date, evidenced by a promissory note. Pursuant to the agreement, plaintiff had the option to convert the note into stock representing 54% of the outstanding shares in defendants' companies. *Id.* The agreement explicitly stated that "[t]he parties acknowledge and agree that this Agreement is a valid and binding agreement, enforceable against each of them in accordance with its terms." *Id.* at 481. Subsequent negotiations revealed several disagreements which prompted defendants to notify plaintiff that negotiations were terminated. *Id.* at 476. Plaintiff brought suit thereafter, arguing that defendants breached the original agreement by refusing to complete the transaction. *Id.*

The Kentucky Court of Appeals held that the agreement lacked "the necessary definiteness of an enforceable contract requiring consummation of the proposed transaction and as lacking the requisite intent of the parties to be bound to same." *Id.* at 478. "[L]ook[ing] to surrounding circumstances and the parties' conduct as a guide," the court concluded that the agreement was not intended to constitute a binding contract to sell the

34

majority interest in defendants' companies. *Id.* Specifically, the court relied on the fact that "(1) throughout negotiations, the parties modified or attempted to modify the Agreement's settled terms (including the ultimate purchase price), and (2) the Agreement itself contemplated that the deal might never close." *Id.* Accordingly, the court held that the agreement was "simply an agreement to negotiate in good faith and, as such, without legal import." *Id.*[19]

In *Giverny Gardens, Limited Partnership v. Columbia Housing Partners Limited Partnership*, 147 F.App'x. 443, 448, 2005 WL 1317291, at *4 (6th Cir. May 16, 2005) the Sixth Circuit recognized *Cinelli* as "authoritative Kentucky law" on "the issue of preliminary agreements between sophisticated business entities." In *Giverny*, the parties entered a "letter of intent" that "outline[d] certain terms and conditions that [would] be the basis" of a partnership agreement. *Id.* at 444. The Sixth Circuit found that, as in *Cinelli*, the evidence in *Giverny* revealed a long and detailed agreement between sophisticated business entities, that consummation of the deal depended on future conditions being satisfied, that both entities intended the agreement to be binding, and that the terms of the agreement contemplated the possibility that the deal could fall through. *Id.* at 449-50. Accordingly, the Sixth Circuit relied on *Cinelli* to hold the agreement unenforceable, even if such a holding would frustrate the clear intention that both parties act in good faith in an attempt to consummate the transaction. *Id.* at 450.

_____

[19] The court contrasted Kentucky law—"the traditional 'all or nothing' approach: Either the agreement is enforceable as a binding contract to consummate the transaction or it is unenforceable as something less"—with other jurisdictions' recognition of agreements to negotiate in good faith as binding. *Id.* (citations omitted).

The Sixth Circuit emphasized that *Cinelli* expressly recognized the "modern trend," which is to uphold preliminary agreements that leave terms open to future negotiations as enforceable contracts. *Id.* at 446. The court also acknowledged that *Cinelli* contrasted the modern trend with Kentucky's "all-or-nothing approach" which requires sufficient definiteness to be an enforceable contract or "is unenforceable as something less." *Id.* (quoting *Cinelli*, 997 S.W.2d at 478). While recognizing the "appeal" of the modern trend, the Sixth Circuit affirmed that its duty as a federal court sitting in diversity was to enforce Kentucky's traditional "all-or-nothing" approach, even if it believed such a law was "unsound." *Id.* at 450. It did so and found the letter of intent unenforceable as a preliminary agreement. *Id.*

Most recently, Chief Judge Russell of the Western District of Kentucky applied *Cinelli* and *Giverny* to hold that a "terms letter," which set forth the terms of financing package, was not a valid contract because "the terms were too indefinite under Kentucky law to be enforceable." *Associated Warehousing,* 2010 WL 2745981, at *4. The court found that the plain language of the letter "contemplate[d] further negotiations of material terms" and that "[t]he court in *Cinelli* [had] specifically held such further negotiations of material terms makes the agreement unenforceable as a contract." *Id.* The court also found that the parties continued to negotiate and modify material terms, which evidenced the parties' intent that the terms letter not be a binding contract. *Id.*

The well-recognized principle articulated in *Cinelli*, *Giverny*, and *Associate Warehousing* applies here to render Plaintiff's alleged Wendy's Agreement void for indefiniteness. Plaintiff relies on one or more of eight documents to establish the existence

of the Wendy's Agreement that set out the following terms:[20]

> 1) a distribution fee of $5.00 per box minimum or 10% of the sale price of the filter pads purchased by all RDWs from CTI and sold to the Wendy's Distribution Centers, whichever is greater; 2) a reduction in the costs of the Pads of $2 per 30-count box or $4 per 60-count box purchased by MidAmerican from CTI; 3) a specification fee (commission) of $2 per 30-count box or $4 per 60-count box shipped by other distributors to Wendy's restaurants; and 4) a term of 10 years for the Agreement.
> (Doc. # 97-1 at 30-31)

As detailed below, careful review of the eight documents Plaintiff relies upon to establish the existence of a contract reveals nearly all the factors Kentucky case law has identified in holding agreements void for indefiniteness (e.g. the documents expressly contemplated future negotiations; negotiations continued on material terms after the agreement was allegedly entered; as a result of negotiations, the terms of the alleged agreement changed).

The Court is aware that unlike *Cinelli*, *Giverny*, and *Associate Warehousing*, Plaintiff's alleged Wendy's Agreement is not a formally executed preliminary agreement. If anything, however, that the parties did not formalize their negotiations or (as was the case in *Giverny* and *Cinelli*) express their intent that the preliminary agreement be binding, reveal that the terms of the alleged Wendy's Agreement are even less definite than those in *Cinelli, Giverny*, and *Associate Warehousing*. Accordingly, the Court considers each of the eight documents that Plaintiff believes constitutes the Wendy's Agreement.

---

[20] Plaintiff does not argue that the parties' course of conduct established a contract. Rather, Plaintiff contends that "CTI entered into an Agreement, both orally and in writing, with MidAmerican." (Doc. # 97-1 at 29). An implied contract "differs from an 'express contract' only in the mode of proof required; and it is implied only in that it is to be inferred from the circumstances, the conduct, and the acts or relations of the parties, rather than from their spoken words." *Newton v. Univ. of Louisville*, No. 2009-CA-2197-MR, 2010 WL 4366360, at *4 (Ky.Ct. App. Nov. 5, 2010) (quoting *Victor's Executor v. Monson*, 283 S.W.2d 175, 176-77 (Ky. 1955)). "To establish a contract implied in fact, the evidence must disclose an actual agreement or meeting of the minds although not expressed and such is implied or presumed from the acts or circumstance which according to the ordinary course of dealing and the common understanding of men shows a mutual intent to contract." *Davis v. Davis*, --- S.W.3d ---, 2011 WL 1196720, at *3 (Ky. Ct. App. April 1, 2011) (quoting *Rider v. Combs*, 256 S.W.2d 749 (Ky. 1953)). Plaintiff has advanced no such argument here.

### 1. September 2, 2003 email

Plaintiff characterizes an email from Bernard to all the RDWs on September 2, 2003, which provided the minutes of the annual Council Meeting, as "initially form[ing]" the terms of the Wendy's Agreement. (Docs. # 97-1 at 7). Specifically Plaintiff points to the section of the email that explains the "National Account Program": "Basic split; 40% Distribution Region, 40% Specifying territory, 20% Destination territory. Distribution Region will receive a $5.00 per box minimum or 10% gross margin whichever is greater on pallet quantity shipments." (Doc. # 66-14).

Bernard's email did not form the initial terms of a Wendy's Agreement, however, because it did not refer to the Wendy's program. Instead, the heading, "National Account Program," applied broadly, to any account that stretched beyond a single, geographic region. (Doc. # 6 at 19). Taken at face value, this definition would seem to include the Wendy's account. But when Goble was asked about the Council Meeting minutes he explained, "Wendy's, no, they weren't a national account." (Doc. # 58 at 67). Later, Goble was asked "when [the email] was sent that time, did that have something to do with Wendy's?" (Doc. # 58-1 at 26). He responded "No." (Doc. # 58-1 at 26).

But even if the email referred to the Wendy's program, Bernard was unequivocal that it did not contain a material term: final pricing. "Payout is determined by the final negotiated price and gross margin available on a case by case basis for each national account." (Doc. # 66-14). Moreover, Plaintiff's purported "initial" terms failed to address material terms that were discussed in subsequent negotiations. For example, it made no mention of the which accounts were "national," when the terms of the supposed agreement would commence

or end, the quantity of cartons included, or spec fees (i.e., commission to the RDW that secured the national account).

### 2. July 22, 2004 email

Plaintiff contends that in a July 22, 2004 email, CTI "reinforc[ed] the initial terms set out in the previous year." (Doc. # 97-1 at 7). But, unlike the September 2003 email, which did not apply to Wendy's, the July 2004 email expressly did apply to Wendy's. (Doc. # 66-7 at 37). Of course, because the July 2004 email applied to a different subject than the September 2003 email, it could not have reinforced terms in the September 2003 email.

As did the preliminary agreement in *Cinelli*, 997 S.W.2d at 478, the July 2004 email indicated that it represented the current status of the parties' negotiations. The email referred to earlier discussions of "financial profiles" for Wendy's and summarized the changes that had occurred since then: The good news, Bernard explained to Goble, was that "we *were anticipating* a $5.00 per carton margin for each RDW—on a weighted basis MidAmerica will now enjoy a $6.75 gross sales." (Doc. # 66-7 at 37) (emphasis added). "[T]he bad news is: in the other RDW's the only way Filtercorp could provide a gross sales margin of $5.00 per carton was to reduce the specification fee to $2.00 per carton." (Doc. # 66-7 at 37). The email closed by highlighting the changes from the estimate made a year earlier: "So, you (Plaintiff) picked up $1.75 per carton on ½ the Wendy's business, and lost $0.50 per carton on the whole system. All in all not too bad of a proposition!!" (Doc. # 66-7 at 37). Additionally, the email contemplated additional changes in the future before pricing was finalized: "The purpose for creating this final financial model . . . is to take into consideration any information that affects costs *before* publicizing final price sheets." (Doc. # 66-7 at 37) (emphasis added).

Though the July 2004 email contained a number of material terms, it also omitted material terms that would need to be completed during future negotiations. The financial model detailed which Wendy's distribution centers (DC) would receive the shipment, the number of stores each DC would service, the delivered price, the RDW price, the destination fee, and the freight charges. But the financial model did not specify the quantity of cartons to be provided, when the "financial model" would take effect, or how long the "final model" would remain in effect.

### 3. August 5, 2004 email

About two weeks later, on August 5, 2004, Bernard provided Goble an updated financial model. Though the August email provided the information in the same format as the July email, Bernard referred to it as "an updated FCMA Price Performa." (Doc. # 58-17). The August email revised and expanded the information first provided in the July email.

The July email raised the price of a 30-count carton to MidAmerican by twenty-five cents and altered the freight charges, which led to a revised, estimated weighted average net of $6.72 for Plaintiff—close, but not the same, as the $6.75 that Bernard had anticipated in his July 2004 email. (Docs. # 66-7 at 37; 58-17). Additionally, for the first time, Bernard's "updated Price Performa" quoted a price for 60-count cartons. (Doc. # 58-17). There is no evidence that these changes were the result of anything but a unilateral decision by CTI (as opposed to negotiations between the parties to amend any agreement that may have been in place). As with the July email, the August email omitted several material terms.

40

### 4. May 19, 2006 email

According to Plaintiff, the next piece of the agreement came nearly two years later in email authored by Goble to Bernard (rather than the other way around), which appears to recount a conversation the two had in Prague. (Doc. # 58-14). Goble's May 2006 email to Bernard reveals that the 2004 financial models did not represent a final agreement, but that negotiations had continued thereafter.

First, the email confirmed that there had been—and would likely continue to be—changes to the Wendy's pricing model. In the email, Goble explained that "[i]t helps me allot [sic] when you commit that any changes to the Wendy's program will be done only after you and I have gotten together and looked at the numbers and determined what is right. Also that what we have in place will stay in place until we have that meeting." (Doc. # 58-14). If anything, this merely suggests a commitment from Bernard to discuss pricing changes with Goble before implementing them. Far from evidencing a final agreement, such a commitment assumes future negotiations toward a final agreement. Indeed, Goble later acknowledged that the email itself sought—but did not embody—a concrete agreement: "I wanted something coming back to me in writing that said this was the deal, because the deals have always been fluid." (Doc. # 58 at 95). In short, Goble acknowledged that at this stage, negotiations were ongoing.

There is no evidence that Goble received the confirmation that he sought from Bernard. This is likely because Bernard did not see any reason to finalize an agreement before Wendy's had even approved the product. (Doc. # 66-6 at 15). Instead, Goble closed the email with his vision for a final agreement in the future (and in so doing,

recognized that no such agreement had yet been reached): "I will speak for all the RDW[s] that we *want* a program that works for you, us and allows money for growth and development for existing and new accounts." (Doc. 58-14) (emphasis added).

Additionally, Goble's May 2006 email omitted material terms, including terms that had been set forth in the 2004 Price Performas. Indeed, Goble's May 2006 email promised only to "forward to you a copy of the letter outlining both the $5 per box and the $2 spec fee for the Wendy's pads." (Doc. # 58-14). The email made no mention of any other terms, including the weighted average mentioned in the 2004 emails, pricing distinctions between 30 and 60-count cartons, Wendy's distribution centers, or the length of any such agreement.

Because Plaintiff's May 2006 email (1) reflected changes to terms from earlier negotiations; (2) acknowledged the likelihood of future negotiations and changes to material terms; (3) contemplated reaching an agreement in the future; and (4) and failed to provide nearly all the material terms, it did not constitute an enforceable agreement.

### 5. June 14, 2006 email

Nearly a month later, Bernard emailed Goble the Price Performa that he had originally provided in August 2004. Plaintiff now construes this email as Bernard "once again confirm[ing], in writing, the terms of the Wendy's Agreement." (Doc. # 97-1 at 16). This characterization ignores Goble's May 2006 email to Bernard that promised a letter "outlining both the $5 per box and the $2 spec fee for the Wendy's pads." (Doc. # 58-14). Plaintiff does not explain how the $5 per box and the $2 spec fee fits the 2004 Price Performa, which does not mention such figures.

More importantly, however, the content of Bernard's email belies Plaintiff's

conclusion that it "confirmed" any agreement. To the contrary, the plain language in Bernard's email assumed that negotiations had been ongoing, would continue, and that no deal had been finalized. "Dave – this is the *model* we have been *discussing* since 04. – Robin." (Doc. # 58-17) (emphasis added).

Goble's testimony further undercuts Plaintiff's reliance on this email. When asked about the 2004 Price Performa, Goble explained that "[i]t was an '04 price matrix applied to the conditions in '04." (Doc. # 58-1 at 9). When asked about the circumstances in 2006 that prompted Bernard to resend the 2004 Price Performa, and how he responded to Bernard's 2006 email, Goble could not remember. (Doc. # 58-1 at 10-11).

### 6. August 17-19, 2006 Council Meeting minutes

CTI met with all the RDWs at its biannual Council Meeting on August 17-19, 2006.[21] Plaintiff contends that the minutes of that meeting constitute "a written agreement. . . . a contract." (Doc. # 97-1 at 17). Specifically, Plaintiff argues that "Robin Bernard, on behalf of CTI, agreed to a 10-year term and price." (Doc. # 97-1 at 16). The minutes evidence no such agreement and, in fact, contemplate additional negotiations.

First, Plaintiff pulled the 10-year term provision from a section of the minutes entitled "New Distribution Agreement," which was unrelated to ongoing Wendy's pricing negotiations. (Doc. # 59-2). Instead, the "New Distribution Agreement"referred to a new, overarching distribution agreement that was to govern CTI's relationship with all the RDWs (including Plaintiff MidAmerican). Negotiations toward such an agreement had started during the August 2006 Council Meeting—well after the negotiations regarding Wendy's

---

[21] The minutes to this meeting, upon which Plaintiff bases its argument of a written agreement, were not distributed to the RDWs until September 1, 2006. (Doc. # 59-1).

pricing had commenced—at the request of the RDWs because of concerns that the 2001 distribution agreement had become outdated. (Doc. # 58-16). The second section of the minutes, by contrast, is devoted to the "Wendy's Distribution Model" and makes no mention of ten years—or any other amount of time, for that matter. Plaintiff simply ignores the fact that the minutes are divided by subject into discrete sections.

Second, the minutes repeatedly indicate that they are not the final terms of a new distribution agreement or a Wendy's pricing model and instead contemplate continuing negotiations. The minutes state that "[t]he new distribution *draft* agreement is targeted to be available for review September 1st – It is the goal of Filtercorp to have all new agreements in place by January 1st 2007." (Doc. # 59-2). As if that was not sufficiently clear, the minutes contain a "To Do" column in which Robin Bernard is tasked with having the "first draft to principals by September 1st for review & comment." (Doc. # 59-2). Additionally, the minutes detail "conditions of sale for national accounts" that mirror the terms set out in the September 2003 email; Goble conceded that the September 2003 email did not apply to the Wendy's pricing model. Moreover, the "To Do" column indicated that these quotes were not final. Rather, Robin Bernard was left "to develop price sheets for each Nat. Acct. with fee structure to distribution."

Similarly, the section of the minutes discussing the "Wendy's Distribution Model" reveals that the model was not final at that point. First, the Wendy's distribution model discussed in the minutes is conditioned on "Wendy's granting Filtercorp market share in FCFW, FCMA & FCSW regions." (Doc. # 59-2). That is, just as in *Cinelli, Giverny*, and *Associated Warehousing*, the preliminary terms contemplated execution of a future agreement.

Third, the "basic distribution model" in the minutes quoted different prices than in any of the preceding documents (though the figures are similar to those in Goble's May 2006 email). (Doc. # 59-2). The minutes provided each RDW's container discount: Plaintiff would receive $7.10, Filtercorp Southeast, $5.00, Filtercorp Southwest $5.25, and Filtercorp Far West, $5.50; the additional "$2.00 per ctn discount to FCMA represents the Specification Credit." (Doc. # 59-2). But even these numbers were not final because the "To Do" column required Robin Bernard "to finalize Wendy's negotiation and distribution Performa for each region." (Doc. # 59-2).

In addition to being subject to future revisions, the figures in the 2006 minutes are different than those found in the 2004 Price Performas, which estimated net weighted averages to MidAmerican of $6.72 and $6.75. In addition, the 2006 minutes provide fewer details than the 2004 Price Performas. Plaintiff makes no attempt to reconcile these differences or explain the absence of material terms.

Finally, if this truly was an agreement to bind CTI and MidAmerican—as Plaintiff now contends—Goble was apparently unaware of its gravity. When asked at his deposition about the 2006 minutes Goble answered: "I don't recall how 7.10, 5.25, and 5.50, those dollar amounts came into play." (Doc. # 58-1 at 41-42).

### 7.     August 28, 2006 email

Though Plaintiff now contends that a ten-year agreement was struck during the August 17-19, 2006 Council Meeting, Bernard emailed Goble less than two weeks later, on August 28, 2006, to clarify matters between their companies; the email followed a conversation the two had had earlier that morning, apparently on the same subject. (Doc. # 58-21).

45

The August 28, 2006 email confirmed that previous correspondence merely reflected the status of negotiations at that time, that the negotiated prices had changed, and that Plaintiff could expect at least one more change. First, the email acknowledged that negotiations had continued on for years and had resulted in multiple changes to terms: "Regarding Wendy's account; we have had multiple discussions over the past couple of years as this account's business proposition has modified." (Doc. # 58-21). Second, the email informed Goble to expect new pricing and that Goble could approve the new pricing: "The distribution Performa will be available for your review and approval no later than Wednesday of this week." (Doc. # 58-21). Lastly, the email confirmed that any previous conversations were merely negotiations, and did not constitute an agreement: "I think you (Goble) will find [the Performa] embodies the spirit of our many conversations these past couple of years." (Doc. # 58-21). Later Bernard explained that in that email he was "trying to tell David [Goble] that we don't have a deal yet" but that "we think we're getting pretty close." (Doc. # 66-6 at 21-22).

Regarding the new distribution agreement—which, again, was independent of the Wendy's pricing model being discussed—Bernard said it would be offered on a ten-year term, and anticipated that he would have a draft ready for review and comment by the RDWs by September 1 so that the draft agreement could be formalized "later this year." (Doc. # 58-21). Clearly, then, the parties had not entered a distribution agreement at the August 2006 Council Meeting, and certainly not one with a ten-year term.

### 8. August 29, 2006 email

A day later, Goble responded to Bernard seeking "clarity" on several key issues. Goble's questions revealed that at this stage, he was under no illusion that MidAmerican

had entered either a general distribution agreement or a Wendy's Agreement with CTI. As to the distribution agreement, Goble asked: "Are we under a ten year agreement today?" (Doc. # 58-22). Regarding Wendy's, Goble asked: "What is the program for the Wendy's distribution and spec credits for the field? You mentioned we would have this by Wednesday, but a head's up would help." (Doc. # 58-22). Goble's email concluded that "[n]obody wants to go forward with all of our projects more than I, but there is allot [sic] of food on the table and I have a family to feed just like you, Jim, Christian, Tony and the other RDW's." (Doc. # 58-22). Goble's later testimony emphasized that no agreement had yet been reached: "[T]here was no clear documentation on what we would make on the account, and I wanted clarity." (Doc. # 58-1 at 29).

Bernard's response, later on August 29, 2006, confirmed again, in unequivocal terms, that (1) a draft of the new distribution agreement had still not been circulated to the RDWs (Goble included); (2) the distribution agreement the companies were operating under was not ten years, but instead expired on December 31, 2006; and (3) Wendy's pricing had not yet been finalized. (Doc. # 58-22).

First, in response to Goble's question, "[a]re we under a ten year agreement today," Bernard responded in no uncertain terms:

> No—FCMA is operating under the terms of the original agreement through December 31 2006. The new distribution agreement is in draft form. The initial draft will be delivered to your office as soon as possible. After its approval and execution, FCMA & CTI will operate under that agreement. As we discussed in Muirfield, it is CTI's commitment to its Filtercorp distribution principals, including; FCMA, FCSE, FCSW & FCFW, the term for the new agreement will be 10 years. I anticipate we will execute this agreement prior to the end of the year; however, the effective date will be January 1, 2007 as discussed.

Second, in response to Goble's request for a "heads up" on Wendy's pricing, Bernard responded "No problem" and wrote:

> [B]asically, the deal is a $5.00 discount to FCSW & FCFW & a $7.00 discount to FCMA. FCMA will receive a $7.00 discount for the NE, or a $2.00 Spec fee depending on CTI's distribution plan for this market, and a $2.00 spec fee for FCSE. A $0.40-$0.50 marketing fee is in the Performa. The $1.25 destination fee is eliminated.
> (Doc. # 58-2)

As with the other correspondence, this quote reflected changes since previous price quotes. First, it quoted a $7.00 discount to Plaintiff instead of the $7.10 that had been quoted in the August 2006 Council Meeting minutes. Second, it added an estimated marketing fee that had not previously been mentioned in any of the Performas or the Council Meeting minutes. Third, it eliminated the $1.25 destination fee (which had not been included in a quote since it was listed as $1.25 in July 2004 and increased to $2.25 in August 2004). Finally, it omitted material terms, such as the quantity of cartons that would be included, when the pricing would take effect, and how long it would remain in effect.

Just as importantly, Bernard explained to Goble that this pricing was not final and that negotiations would continue:

> *Issues remaining begin* with ensuring the model works on a delivered basis to the DC for all the markets; thus, the delay. In addition, another complication exists between FCSW & FCFW regarding the Denver market—it must ship from Dallas to work; however, it is in FCFW's market—so, we are working on a compensation program between the two RDWs. *Until distribution is finalized and published*, this model is the backbone of the program consistent with the 2004 worksheets.
> (Doc. # 58-22) (emphasis added)

Goble himself later suggested that the deal was not final at this point. When asked at his deposition whether, following these emails, "the deal with Wendy's [was] still fluid," Goble responded that "[i]t was a lot less fluid, based on this letter." (Doc. # 58-1 at 38).

Even assuming, for the sake of argument, that Bernard's response regarding Wendy's constituted final pricing terms, the evidence irrefutably establishes that the parties had not agreed on the ten-year term, but instead continued to negotiate the length of the proposed agreement. (Docs. # 59-6; 59-9; 58-1 at 76). Indeed, Bernard's email expressly stated that the forthcoming draft distribution agreement would not take effect until "[a]fter its approval and execution." (Doc. # 58-22). The parties agree that Goble never executed the agreement.

### 9.    Additional Evidence

In addition to the eight documents Plaintiff relies upon, other evidence reveals no genuine dispute that the indicia of indefiniteness identified in *Cinelli*, *Giverny*, and *Associate Warehousing* are present here.

First, Goble repeatedly and consistently testified that the deal was fluid and constantly changing. He testified that in 2005—after the September 2003 email and the 2004 price Performas—the terms of his relationship with CTI "was always fluid" and often changed. (Doc. 58 at 28). Later during his deposition Goble referred to the Wendy's deal as "always fluid." (Doc. # 58 at 64). Referencing the May 2006 email, Goble testified that he was trying to confirm a price because "the deals have always been fluid." (Doc. # 58 at 95). Goble also testified that by August 2006, the deal was starting to take shape and "was a lot less fluid." (Docs. # 58-1 at 38; 58-2 at 10). Nonetheless, on February 1, 2007, Goble emailed the Bernards "confirming the program for all the RDW's." (Doc. # 59-14). When asked why, Goble said he was concerned about being cut out of the Wendy's deal because "[o]ur deal was fluid." (Doc. # 58-2 at 17). Finally, referring to CTI's February 9, 2007 decision to disallow RDWs to pay for Wendy's orders with American Express cards,

Goble explained: "[W]hen I talk in terms of fluid, I mean that everything changes it. You know, we were operating under an agreement and then it changes." (Doc. # 58-2 at 19).

But it was not just Goble who believed the terms were fluid. So did the Bernards. At her deposition, Laura Bernard was presented with the August 2006 Council Meeting minutes and asked about pricing sheets. She testified that the pricing model for Wendy's "was fluid. It was different in '96 and '97, '98 and '99, and it was different in 2006. It was different in 2007, and it was different again in 2008." (Doc. # 7 at 34). Laura Bernard said that she and Robin were "so frustrated because, of course, it changed. We first started quoting before we even had reps. We then started quoting when we had RDWs. So has it changed over the years with the distribution[?] . . . I mean, of course, it's changed." (Doc. # 7 at 34). Similarly, Robin Bernard confirmed that terms changed frequently: "And we told him (Goble) that the final deal would be set when we knew what our costs were and we knew what our final price was going to be, and it was. That is not the only program that there's been fluidity in." (Doc. # 6 at 37).

Because, as Goble and the Bernards acknowledged, the deal was constantly "fluid," changing, and under negotiation, any Wendy's Agreement would only have reflected the current status of negotiations and, therefore, is unenforceable for indefiniteness.

Second, though Plaintiff contends the Wendy's Agreement was completed with the August 2006 email, the evidence reveals that Goble and Bernard continued to negotiate material terms thereafter. As noted previously, negotiations between CTI and the RDWs regarding the general distribution agreement continued in December 2006 and January 2007, until a final draft was distributed in February 2007. (Docs. # 59-9; 59-13; 59-18). Of course, this is the agreement that would have been for ten years, but Goble refused to sign

it.

Additionally, negotiations and revisions specific to Wendy's pricing continued after the August 2006 email. On February 1, 2007 Goble emailed the Bernards to thank them "for confirming the program for all the RDW's last evening. . . that being a $2 fee for a box of 30 pads and $4 fee [for] a box of 60 pads . . . [t]he distribution discount will be $5 for a 30 count and $10 for a 60." (Doc. # 59-14). On February 9, 2007, Bernard altered the Wendy's pricing model by informing the RDWs that CTI would not accept American Express. (Doc. # 59-15). The same day, Bernard asked Goble if he would "voluntarily reduce [MidAmerican's] specification fee" because of pricing changes. (Doc. # 59-17). Bernard expressed appreciation for Goble's "support as [we] *finalize* all 'deals' making them alright for everyone." (Doc. # 59-17) (emphasis added). Then again, on February 20, 2007, Bernard emailed the RDWs explaining "modified Filtercorp Terms" following a "negotiat[ion]" with Goble, which would permit the RDWs an additional 15 days for payment. (Doc. # 59-16).

Still, the negotiations continued. Following the disastrous Wendy's rollout, the terms were again in flux. On August 1, 2007 Goble referenced an "agreement" to pay MidAmerican $1 a box spec fee while distribution was done outside the RDWs and expressed concern that Wendy's was using an insufficient quantity, which cut into MidAmerican's expected earnings. (Doc. # 59-24). Goble maintained throughout his deposition, however, that Plaintiff was entitled to a $2 spec fee. (Doc. # 58-2 at 48-49).

Then, in September 2007, Goble presented Bernard with a new proposed agreement, which would have required CTI to compensate MidAmerican for Wendy's 2007 orders, and thereafter guarantee a minimum of $324,000 annually for 10 years. (Doc. #

59-30). Bernard rejected the agreement. (Doc. # 59-30). Finally, in a September 25, 2007 email, Bernard explained why he had rejected Goble's offer and that "[p]ayment of fees to MidAmerica from the Wendy's business has already been defined by practice." (Doc. # 59-31). In sum, the August 2006 email could not have constituted the final terms of any Wendy's Agreement when negotiations continued for over a year thereafter.

Third, Goble has repeatedly testified to his belief that the Wendy's Agreement contained terms that Plaintiff no longer argues it contains. For example, Goble has testified that the "agreement" he reached with Bernard was embodied in the August 2006 email and "said we would earn 325,000 a year if we got the orders." (Doc. # 58-2 at 7). Later, Goble explained that MidAmerican was operating "under the agreement" that "said we would make 325,000 a year if Wendy's bought the products." (Doc. # 58-1 at 79). Notably, Plaintiff no longer contends that a $325,000 annual minimum is part of the agreement. This discrepancy suggests that material terms—such as minimum revenue guarantees—remained in doubt long after the August 2006 email.

Finally, as in *Cinelli*, *Giverny*, and *Associated Warehousing*, this was effectively an agreement to agree when CTI secured Wendy's as a customer. In *Cinelli* and *Giverny*, consummation of the final deal was contingent on completion of due diligence and regulatory approval. Similarly, here, finalization of material terms and consummation of an agreement was contingent on securing Wendy's as a customer.

In *Cinelli*, 997 S.W.2d at 478, the Kentucky Court of Appeals held that the parties' formally executed agreement was nothing more than a reflection of the current status of negotiations because it omitted material terms and contemplated continued negotiations toward a final agreement. Likewise, the eight documents Plaintiff relies upon here reflect

52

multiple changes in material terms over several years, contemplate continued negotiations of material terms, and fail to provide numerous material terms. Accordingly, the Wendy's Agreement is unenforceable for indefiniteness.

### C. Alternatively, even if the Wendy's Agreement was enforceable, it did not include a termination date and, therefore, was terminable at will by either party

Alternatively, even if there was an enforceable Wendy's Agreement, it contained no termination date and was, therefore, terminable at will. It is "the law and public policy of this state" that a business contract without a termination date is terminable at will by either party. *Elec. & Water Plant Bd. of Frankfort v. S. C. Bell Tel. Co.*, 805 S.W.2d 141, 143 (Ky. Ct. App. 1990). For example, the franchise agreement in *Brownsboro Road Restaurant, Inc. v. Jerrico, Inc.*, 674 S.W.2d 40, 41 (Ky. Ct. App. 1984) included a termination for cause provision, but no termination date. The Kentucky Court of Appeals concluded that the agreement fell "into the category of contracts which specify no time for termination." *Id.* "Such contracts will not, in absence of unequivocal language, be construed as running into perpetuity." *Id.* (citing *Mid-Southern Toyota, LTD v. Bug's Imports, Inc.*, 453 S.W.2d 544 (Ky. 1970)). Instead, Kentucky "is committed to the rule that where a contract covers no definite period, it may be terminated by either party at will." *Id.*

The Sixth Circuit addressed facts similar to those at bar in *Shane v. Bunzl Distrib. USA, Inc.*, 200 F.App'x 397, 399, 2006 WL 2472853 (6th Cir. Aug. 25, 2006). The plaintiff there was paid a commission for helping the defendant secure business with Wal-Mart, pursuant to the terms of a letter. *Id.* After six years, the defendant lowered plaintiff's commission rate several times in a short period of time, which prompted the plaintiff to file suit; a month later, the defendant terminated the parties' agreement. *Id.* at 399-400. The

Sixth Circuit found that because the letter lacked any term about its duration it was "terminable at will by either party under Kentucky law." *Id.* at 402.

Plaintiff repeatedly states that the parties agreed that the Wendy's Agreement would be for a term of ten (10) years, but the evidence undisputably refutes such a conclusion. First, Plaintiff's breach of contract claim is based on a "Wendy's Agreement" that was, according to Plaintiff, independent from the general distribution agreement that was negotiated among all the RDWs and CTI from August 2006 through February 2007. Indeed, Goble readily conceded that MidAmerican did not execute the general distribution agreement, and explained that part of his concern was that the general distribution agreement would supersede the alleged Wendy's Agreement. (Doc. # 58-2 at 7). Plaintiff nonetheless attempts to incorporate the ten-year term proposed in the general distribution agreement into the Wendy's Agreement.

Plaintiff's attempt to argue that the Wendy's Agreement contained a ten-year term is disingenuous. On the one hand, to argue that it had an agreement with CTI, Plaintiff contends that the Wendy's Agreement was separate and distinct from the general distribution agreement. Plaintiff must make this argument because, if this is not so, its contract claim is doomed by Goble's repeated admissions that Plaintiff refused to execute the general distribution agreement. But, on the other hand, Plaintiff conflates the two agreements in arguing that the Wendy's Agreement included a ten-year term. That is, Plaintiff distinguishes between two independent agreements when it is convenient, and conflates the two agreements when it is not.

In the end, however, neither side of the coin saves Plaintiff's argument that the Wendy's Agreement was for ten years because the evidence demonstrates (1) that

54

Defendant CTI offered the ten-year term only as part of a larger distribution agreement (Docs. # 58-21; 58-22; 59-2); and (2) that Plaintiff never accepted the distribution agreement.

Because the Wendy's Agreement did not include a ten-year term, and Plaintiff has offered no evidence that it contained any other term, the Court finds that the Wendy's Agreement provided no termination date. Accordingly, the Wendy's Agreement was terminable at will by either party. *See Shane,* 200 F.App'x at 402 ("The district court correctly concluded that, because it lacked any term about its duration, the May 1995 Letter Agreement is terminable at will by either party under Kentucky law.").

However, Kentucky's terminable-at-will rule is moderated by a requirement that the terminating party provide reasonable notice of termination. *Hunt Enters., Inc. v. John Deere Indus. Equip. Co.*, 18 F.Supp.2d 697, 700 (W.D.Ky. 1997). "Reasonable notice is that period of time which, under the circumstances of the case, would allow one to make alternative arrangements upon cessation of the contract and minimize losses." *Pharo Distrib. Co. v. Stahl,* 782 S.W.2d 635, 638 (Ky. Ct. App. 1989). "[W]hether reasonable notice was given under the circumstances of the case is a question of fact . . . unless only one legitimate inference can be drawn from the facts proven, in which case the question is one of law for the court." *Id.* (citations omitted). In making this determination, the Court considers "[t]he obvious object of the reasonable notice requirement": "[T]o afford the party losing the contract an opportunity to make appropriate arrangement in lieu thereof by dispersing inventory, adjusting work force, exploring probable alternatives, and in general, 'getting his house in order' to proceed in absence of the former relationship." *Id.*

Thus, to survive summary judgment Plaintiff must "'present more than a mere scintilla of evidence' that [Defendant CTI] did not provide it with a reasonable period of time to get its house in order prior to terminating their agreement." *W. Ky. Coca-Cola Bottling Co., Inc. v. Red Bull N. Am., Inc.*, No. 1:08-CV-56-R, 2010 WL 65029, at *6 (W.D.Ky. Jan. 5, 2010). Plaintiff has not done so.

Beginning in mid-2007, Defendant repeatedly warned Plaintiff that their agreement was in jeopardy. On August 9, 2007, Defendant CTI notified Plaintiff that it had discussed the parties' relationship with an attorney and contemplated informing Plaintiff that it was in breach. (Doc. # 59-25). A day later, Defendant CTI formally notified Plaintiff that it was in breach of their 2001 agreement (the only agreement Defendant CTI believed they were operating under). (Doc. # 59-26). On September 25, 2007, Defendant CTI rejected a new proposal from Plaintiff. (Doc. # 59-30). Then, on October 2, 2007, Defendant CTI again expressed concern about Plaintiff's failure to execute the general distribution agreement and demanded that Plaintiff do so by October 15, 2007. (Doc. # 59-33). Finally, and most importantly, on October 17, 2007, Plaintiff filed suit against Defendant CTI. (Doc. # 1-6 at 32). Still, Defendant did not terminate its relationship with Plaintiff until October 26, 2007—more than a week later. (Docs. # 74-4; 74-5).

As was the case in *Western Kentucky Coca-Cola*, 2010 WL 65029, at *6, Plaintiff here "has not provided any evidence that [Defendant CTI] did not give it reasonable notice in terminating their agreement." Instead, the evidence shows that Defendant repeatedly warned Plaintiff of the possibility of termination, and waited more than a week after Plaintiff commenced this action to terminate any agreement. *See Shane*, 200 F.App'x at 402 (finding plaintiff's breach of contract claim "insufficient as a matter of law" where defendant

56

terminated a terminable at will agreement approximately one month after the plaintiff brought suit). These facts establish that Defendant CTI provided Plaintiff "reasonable notice" of termination; therefore, Plaintiff's breach of contract claim fails.

Even if Defendant CTI did not provide reasonable notice, Plaintiff has failed to provide sufficient proof of damages. "Since it is the failure to give reasonable notice of termination rather than the termination of the contract itself which constituted the breach, the damages must, of necessity, be attuned to this failure." *Pharo*, 782 S.W.2d at 639. Thus, "[t]he damages may not reflect loss of a contract or discontinuance of a business relationship." *Id.* This is because it is not "relevant that a party losing an at-will contract suffers losses" because "this is an inherent probability." *Id.* at 638. As such, "[t]he loss . . . suffered must be limited to those elements directly relating to lack of notice and the lost opportunity to 'put his house in order.'" *Id.* at 639.

Plaintiff has not put forward any evidence of damages that it incurred as a result of insufficient notice of termination. Plaintiff has proffered evidence of the investments it expended in landing Wendy's as a CTI customer, but those losses are unrelated to any delay in notice of termination. Accordingly, Kentucky case law prohibits such damages. *See Pharo*, 782 S.W.2d at 639 (Plaintiff "asserts he was entitled to an instruction permitting him to recoup his investment as the contract was prematurely terminated . . . . We reject this argument.); *W. Ky. Coca-Cola*, 2010 WL 65029, at *6 (holding that "[p]ast expenses are not recoverable"). Likewise, Kentucky law prohibits Plaintiff's attempt to recover future profits because losses for breach of a terminable-at-will agreement are "limited to those incurred during the time span of what would have been 'reasonable notification.'" *Pharo*, 782 S.W.2d at 639 (citing *Circo v. Spanish Garden Food Mfg. Co.*, 643 F.Supp. 51

(W.D.Mo. 1985)).  As such, even if Defendant failed to provide "reasonable notice" of its decision to terminate the terminable-at-will contract, Plaintiff's failure to evidence any resulting damages renders its breach of contract claim meritless.

### D.    Unjust Enrichment and Quantum Meruit

The parties devote substantial portions of their briefs to Plaintiff's contention that unjust enrichment and quantum meruit are independent theories of recovery.  As Plaintiff correctly observes, the court in *Realty Unlimited, Inc. v. Ball Homes, LLC*, No. 2007-CA-1658-MR, 2009 WL 50179, at *5 (Ky. Ct. App. Jan. 9, 2009) provided similar, but independent, tests for unjust enrichment and quantum meriut.  But, as Defendant points out, *Realty Unlimited* and other cases contain language that appears to conflate the two theories:  "A contract implied by law allows for recovery *quantum meriut* for another's unjust enrichment."  *Id.* (quoting *Perkins v. Daugherty*, 722 S.W.2d 907, 909 (Ky. Ct. App. 1987) (emphasis added)).

As a federal court sitting in diversity, however, this Court is "in effect another court of the forum state, in this case Kentucky, and must therefore apply the substantive law of that state."  *Gahafer v. Ford Motor Co.*, 328 F.3d 859, 861 (6th Cir. 2003).  Neither party has presented a decision from Kentucky's highest court expressly resolving this matter.  Thus, where Kentucky's "appellate court has resolved an issue to which the high court has not spoken, we will normally treat those decisions . . . as authoritative absent a strong showing that the state's highest court would decide the issue differently."  *Managed Health Care Assocs., Inc. v. Kethan*, 209 F.3d 923, 928 (6th Cir. 2000) (quoting *Kurczi v. Eli Lilly & Co.*, 113 F.3d 1426, 1429 (6th Cir. 1997)).  It is not for this Court to refuse to follow Kentucky appellate court decisions just because it believes the rule is unsound.  *Kurczi,*

58

113 F.3d at 1429.

Because the Kentucky Court of Appeals in *Realty Unlimited* provided independent tests for unjust enrichment and quantum meruit, the Court will apply the two tests here.[22] Ultimately, the Court's decision to apply independent tests does not affect the outcome of the parties' motions because the Court finds that Defendant CTI is entitled to summary judgment under either theory of recovery.

For Plaintiff to prevail under unjust enrichment, it must establish three elements: "(1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009). To recover under quantum meruit, in turn, Plaintiff must prove: "(1) that valuable services were rendered, or materials furnished; (2) to the person from whom recovery is sought; (3) which services were accepted by that person, or at least were received by that person, or were rendered with the knowledge and consent of that person; and (4) under such circumstances as reasonably notified the person that the plaintiff expected to be paid by that person." *Quadrille*, 242 S.W.3d at 366. As Plaintiff concludes, the elements of the two claims are "similar," but to prove quantum meruit, Plaintiff must establish that Defendant was sufficiently notified of Plaintiff's expectation of being paid. (Doc. # 97-1 at 42).

The evidence demonstrates that Plaintiff provided Defendant CTI with a valuable benefit. It is undisputed that Plaintiff worked with Mike Landis at Wendy's to test and,

---

[22] As Defendant points out, the court in *Realty Unlimited,* 2009 WL 50179, at *5, provided two distinct standards, but applied the standards concurrently. This is likely because, as Plaintiff acknowledges, the two tests are very similar. As such, the Court will apply the two standards at the same time.

ultimately, approve CTI's filter pads. The record also establishes that Plaintiff worked to resolve problems that arose during the testing and rollout phases. Defendant CTI has repeatedly recognized Plaintiff's efforts toward securing a deal with Wendy's, including publicly thanking Goble, Jr. for going "above the call of duty." (Doc. # 6-18). Defendant continues to benefit from Plaintiff's efforts as it remains a Wendy's supplier. Because Plaintiff provided Defendant a valuable benefit, the first two elements of both theories of recovery are satisfied.

The third and final element of unjust enrichment is that Defendant inequitably retained a benefit without payment for its value. The final two elements of quantum meruit are similar; they require that Defendant accepted the benefit of Plaintiff's efforts, and that Defendant recognized that Plaintiff expected to be paid for the services. It is on these elements that Plaintiff's equitable claims fail.

In *Bishop v. American States Life Insurance Co.*, 635 S.W.2d 313, 315 (Ky. 1982) the Kentucky Supreme Court recognized that not all efforts that benefit another party are entitled to be compensated: "Although the theory of quantum meruit is still a sound and just rationale, the structure and nature of today's complex, industrial society has eroded the concept of quantum meruit and made it less than viable for all situations." The Court explained:

> There are some professions, such as insurance, real estate and sales, wherein quantum meruit has little applicability. The realtor may spend untold hours in trying to locate a house for a prospective buyer or show one particular house to many different people, but until a sale is consummated, the realtor is entitled to no compensation.

The court in *Quadrille,* 242 S.W.3d at 366, explained that the principle laid out in *Bishop* is "entirely consistent with the general rule" articulated in 66 Am.Jur.2d *Restitution*

60

*and Implied Contracts* § 47 (2001): "Where no compensation is agreed upon in advance for services requested by and performed for another, the presumption that compensation was intended is rebutted by circumstances which negative such an intention." One such circumstance "is a strong self-interest in the outcome of the transaction by the person furnishing the services." *Id.* This led to the rule that

> the expectation of a future business advantage or opportunity cannot form the basis of a quantum meruit claim; a company cannot recover for the alleged services it renders in submitting a program to a second company where it is conclusively established as a matter of law that the alleged services were preliminary services performed without any thought of direct cash compensation but with a view to obtaining business through a hoped-for contract.
> *Id.* at 366-67.

This rule prohibits Plaintiff from recovering here. First, notwithstanding Plaintiff's argument to the contrary, there is no genuine dispute that Plaintiff did not expect "direct cash compensation" for its services. Plaintiff hoped that its work would result in CTI being approved as a Wendy's supplier and that it, in turn, would profit as a result. As Plaintiff conceded, "rather than a traditional commission, Plaintiff expected a discount on the cost of CTI's filters so that they could be resold at a profit." (Doc. # 97-1 at 44). That is, Plaintiff expected to buy the filter pads at a set price, and sell the pads to Wendy's at a set mark-up. Though Plaintiff has now tallied the expenses it incurred in the pursuit of Wendy's (Doc. # 63-1), there is no evidence or assertion that Plaintiff requested payment or reimbursement from CTI for these expenses.

Instead, the record is clear that Plaintiff incurred these expenses "with a view to obtaining business through a hoped-for contract." *Quadrille*, 242 S.W.3d at 367. Indeed, the minutes from the August 2006 Council Meeting (upon which Plaintiff rests its claim of

an agreement) expressly state that the discount anticipated for the RDWs in the Wendy's distribution model "is based on Wendy's granting Filtercorp market share" in several regions. (Doc. # 59-2). Because Plaintiff provided its services "without any thought of direct cash compensation but with a view to obtaining business through a hoped-for contract," recovery under quantum meruit or unjust enrichment is unavailable.

Plaintiff first attempts to distinguish *Quadrille* from this case. As initial matter, though, the rule from *Quadrille* is neither new nor limited to the facts of that case. Rather, *Quadrille*, 242 S.W.3d at 367, merely recited "the general rule that there can be no recovery for services performed without thought of a direct cash payment nor for those performed to obtain a future business contract." Indeed, the court in *Quadrille* went out of its way to survey other jurisdictions and in so doing found that other state and federal courts "have consistently agreed with the recited rule." *Id.*

Additionally, Plaintiff contends that the rule from *Quadrille* is only applicable where a plaintiff provides services to a defendant in hopes of obtaining business from that same defendant. Thus, Plaintiff argues that *Quadrille* could only apply if Plaintiff was seeking compensation from Wendy's. (Doc. # 97-1 at 44-45). But Plaintiff did not provide services to Wendy's, it provided services to CTI. Any involvement Plaintiff had with Wendy's was done as a service to CTI, as a representative of the Filtercorp brand. And Plaintiff performed these services with the hope of securing a contract with CTI. Indeed, the evidence reveals regular negotiations between the parties in anticipation of an agreement between Defendant and Wendy's which, in turn, would yield an agreement between Defendant CTI and Plaintiff MidAmerican.

Finally, Plaintiff relies on a Fifth Circuit case interpreting Texas quantum meruit law. Though Plaintiff contends that Texas law is "substantively identical to Kentucky's," Defendant correctly points out that it is inapplicable here. (Docs. # 97-1 at 45; 118 at 35). Moreover, while the Texas case did involve a manufacturer that sold products to a distributor who, in turn, sold them for a markup, it is readily distinguishable from the facts here. In *Infra-Pak (Dallas), Inc. v. Carlson Stapler & Shippers Supply, Inc.*, 803 F.2d 862, 863 (5th Cir. 1986) the distributor worked without success to sell a particular machine to a customer. A few months after the distributor's last sales attempt, the customer contacted the manufacturer directly and purchased a different product than the one the distributor had been promoting. *Id.* The distributor brought suit for the commission it would have received for the sale of that different product. *Id.* Unlike *Infra-Pak*, in this case, Plaintiff MidAmerican actually worked and encouraged the customer (Wendy's) to enter a contract with Defendant CTI.

More importantly, *Infra-Pak* did not address the issue presently before the Court—whether recovery by unjust enrichment or quantum meruit is barred where the services provided were preliminary work towards a hoped-for contract. That is likely because that question was not before the *Infra-Pak* court; the issue was first addressed in Texas four years later in *Peko Oil USA v. Evans*, 800 S.W.2d 572, 575 (Tex. Ct. App. 1990).

When a Texas court did address the issue, it adopted the same rule as Kentucky. In *Peko Oil*, the Texas court held that the plaintiff's services "were preliminary services that were performed with a view to obtaining business through a hoped-for contract. Therefore, we conclude further that in the present case, no recovery can be had for the alleged

services as a matter of law." *Id.* at 578. The Court can only speculate, but it is likely that the facts of *Infra-Pak* would yield a different result following *Peko Oil*.

In sum, "[t]he law in this Commonwealth is clear that where one person does a service that benefits both that person and another, there can be no recovery by the person against the other under the unjust enrichment or *quantum meruit* doctrines, because the service is ordinarily performed without the expectation of payment." *Realty Unlimited*, 2009 WL 50179, at *6. Put differently, there is no genuine dispute that Plaintiff provided Defendant services "without any thought of direct cash compensation but with a view to obtaining business through a hoped-for contract" that would come after Wendy's approved Defendant as a supplier. *Quadrille,* 242 S.W.3d at 366-67 (quoting 66 Am.Jur.2d *Restitution and Implied Contracts* § 47 (2001)). Accordingly, Plaintiff's claims for recovery under quantum meruit and unjust enrichment are without merit.

## III. CROSS MOTIONS FOR SUMMARY JUDGMENT ON ALTER EGO THEORY

Both Plaintiff and Defendant CRS have moved for summary judgment on Plaintiff's alter ego claim. (Docs. # 77, 98). As the Court found in affirming the Magistrate Judge's bifurcation Order, "[w]hether it is necessary to pierce the corporate veil depends on whether Plaintiff succeeds on its underlying claims of breach of contract and unjust enrichment." (Doc. # 93 at 9). That is because piercing the corporate veil is "recognized as being an equitable remedy, not a cause of action unto itself, which is used as a means of imposing liability." (Doc. # 93 at 7) (quoting *Daniels v. CDB Bell, LLC,* 300 S.W.3d 204, 211 (Ky. Ct. App. 2009)). For the reasons set forth in this Memorandum Opinion and Order, Plaintiff's underlying claims have failed.

Thus, for the reasons stated in its March 2011 bifurcation Order (Doc. # 93), the Court finds dismissal of Plaintiff's underlying claims dispositive of Plaintiff's alter ego theory of recovery against Defendant CRS. Accordingly, CRS's motion for summary judgment is **granted**.

## IV.  CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that

1.  Defendant CTI's Motion for Summary Judgment (Doc. # 74) is **GRANTED**;

2.  Plaintiff MidAmerican's Motion for Summary Judgment against CTI (Doc. # 97) is **DENIED**;

3.  The abeyance over Plaintiff MidAmerican's and Defendant CRS's Cross Motions for Summary Judgment (Docs. # 106, 121) is **LIFTED**;

4.  Defendant CRS's Motion for Summary Judgment (Doc. # 77) is **GRANTED**;

5.  Plaintiff MidAmerican's Motion for Summary Judgment against CRS (Doc. # 98) is **DENIED**;

6.  Plaintiff MidAmerican's Amended Complaint (Doc. # 1-4 at 15) is **DISMISSED**; and

7.  This is a **FINAL** and **APPEALABLE** Order.

A separate Judgment shall be entered concurrently.

This 10th day of August, 2011.



Signed By:

_David L. Bunning_

United States District Judge